## COIT *v.* NORTH CAROLINA GOLD AMALGAMATING Co. and others.*

*(Circuit Court, E. D. Pennsylvania. October 7, 1882.)*

1. CORPORATION—UNPAID INSTALLMENTS ON STOCK—RIGHT OF CREDITOR TO INQUIRE AS TO CONSIDERATION PAID FOR STOCK.

    While unpaid installments on stock ordinarily constitute a trust fund for the payment of the corporate debts, yet where stock has been issued to a stockholder and settled for by him under an arrangement made in good faith with the company, it is not in the power of a creditor, in all cases and as a matter of right, to institute an inquiry as to the value of the consideration given for the stock, and disturb the arrangement so made.

2. SAME—SUBSCRIPTION IN PROPERTY.

    Where the capital subscribed is settled for by the transfer to the corporation of personal property belonging to the subscribers, at an honest valuation fairly made and agreed upon between them, they cannot be held individually liable to creditors because the value of the property, estimated in the light of subsequent events, will not equal the amount at which it was received.

3. SAME—KNOWLEDGE OF CREDITOR.

    And even where, upon the purchase of additional property, the capital has been increased by the issue and distribution of new stock to a much larger extent than the cost or value of the additional property, the stockholders cannot be held individually liable at the suit of a creditor who was cognizant of the whole transaction and acquiesced in it.

Hearing on Bill, Answer, and Proofs.

This was a bill filed by a judgment creditor of a corporation against the corporation and its stockholders for a decree for the payment by the stockholders of his debt. The material facts were as follows:

In January, 1874, a number of persons who had been carrying on mining operations under the name of "The North Carolina Gold Amalgamating Company," applied for and obtained a charter of incorporation under the same name. The charter provided for minimum capital of $100,000, divided into 1,000 shares of $100 each, with power to increase the capital to $2,500,000, or 2,500 shares. The charter further provided: "The subscription to the capital stock of said company shall and may be paid in such installments, and in such manner and such property, real or personal, as a majority of the corporators may determine." The $100,000 capital was subscribed as follows: The corporators met and separate valuations were made by them of certain personal property owned by the association, the average valuation being $137,000. It was then agreed that the property should be estimated at $100,000, and shares of stock issued therefor and divided among the corporators in proportion to their interests. In the valuation was included a supposed value of the charter, but it appeared that without this there was over $100,000 worth of property at the valuations made by the corporators.

Some time after this, negotiations were commenced for the purchase of land on which the company was operating, which resulted in an arrangement with

*Reported by Frank P. Prichard, Esq., of the Philadelphia bar.
Affirmed. See 7 Sup. Ct. Rep. 231.

the owner by which the land was converted into capital of the company, and the capital was increased to $1,000,000, or 10,000 shares of $100 each, of which the personal property of the corporation was to represent 4,000 shares, the land 2,000 shares, and the residue held for sale to procure money to carry on the operations of the company. This arrangement was carried out, and 4,000 of the new shares were issued to the stockholders upon the surrender of their old certificates. The complainant, Coit, was the holder of a second mortgage on the land purchased, and under an arrangement with the company he surrendered his old mortgage and took obligations of the company secured by a new mortgage.

Some time after the purchase the title to the land was disputed by new claimants, and a new arrangement was made, by which the stockholders surrendered the new stock which had been issued to them, and retained only the $100,000 originally issued.

It was claimed on behalf of complainant that both the original valuation of the property of the association and the valuation of the land purchased were fraudulent, and that only a small part of the $100,000 original capital had ever been actually contributed. On the other hand, the respondents claimed that the valuation of the company's property had been made *bona fide*, and that the arrangement for the purchase of the real estate and increase of stock had been made with the knowledge and acquiescence of complainant.

*George Biddle, Edward F. Hoffman,* and *Charles Hart,* for complainant.

*Pierce Archer* and *Richard C. McMurtrie,* for the gold company and certain stockholders.

*H. T. Fenton, L. R. Fletcher, William A. Husband, Thomas H. Neilson, W. H. Smith, George Bull, W. C. Bullitt,* and *George Junkin,* for stockholders.

BRADLEY, Justice, (*orally.*) The case of *Coit* v. *North Carolina Gold Amalgamating Co. et al.* has received our consideration, and we are now prepared to announce an opinion. Complainant's counsel have, by a very fair presentation of authorities, based the claim against the stockholders upon the doctrine that the capital stock of a corporation is a trust fund which is liable for the claims of creditors, and the general proposition cannot of course be controverted; that is to say, it is liable after a corporation becomes insolvent. Prior to its insolvency a corporation holds its property as any other person, not in trust, but absolutely in the exercise of direct dominion and supreme control. But when a corporation becomes insolvent, then, according to the holding of courts of equity, its property becomes a trust fund for the payment of creditors. This is true, at all events, in cases where the property has not been subjected to execution, or disposed

of by way of assignment or other appropriation to particular debts. But the principles upon which that trust is administered are not so simple as might at first be supposed. The trust embraces all the property of a corporation; embraces its real estate and its choses in action. If debts are due to the corporation they are part of that fund, and may be collected by the proper representative of the corporation, whether a trustee appointed by a court of equity, an assignee in bankruptcy, or other agent, for the parties interested. But it is only those claims or assets which a company has that belong to the trust fund. Unpaid installments on stock in the ordinary case are assets; they are claims which a company could enforce, and therefore they are claims which the creditors can compel the enforcement of through the instrumentality of a court of equity.

But there are cases in which arrangements have been made for the payment of stock which preclude the company itself from enforcing any further payment thereon, and yet in which, as to creditors who can fairly allege that they have relied, or whom the law presumes to have relied, upon the amount of capital stock of the company, the courts will impose a trust upon the subscription, and set aside the arrangement made for its payment. But that trust does not arise absolutely in every case where capital stock has been issued, and where it has been settled for by arrangement with the company. It is not as if the stockholders had given their promissory notes for the amount, those notes being in the treasury of the company; but there are often equities to which the stockholders are entitled,—on which they are entitled to stand.

I suppose that in the case of stock dividends fairly made, in consideration of profits earned, and of accumulations of the property of the company,—made simply to represent the property, and fairly representing the same,—dividends made of stock as full-paid stock, without any dishonest purpose, without any purpose to deceive or defraud anybody,—I suppose that in a case of that kind a court of chancery would have no power to revive a claim against the stockholders because they had not advanced actual cash for the shares. There are considerations, therefore, affecting this question of liability for stock on which money has not been actually paid, which must be taken into consideration in order to do justice. It is not true that it is in the power of a creditor in every case, and in all cases, as a mere matter of right, to institute an inquiry as to valuation of the amount of the consideration given for the stock, and disturb fair arrangements for its payment in other ways than by cash. If the stock has been

fairly created and paid for, there is an end of trusts in favor of anybody; and this does not affect the general proposition that unpaid subscriptions of stock are a trust fund to be administered for the benefit of creditors after a corporation becomes insolvent.

Now, in looking at the present case, as to the first thousand shares of stock, it seems to us manifest, from the evidence in the case, that the company—the associates who formed the company—regarded, and, so far as we can see, honestly regarded their plant—the property that they contributed — as worth the hundred thousand dollars for the amount of which stock was issued. They estimated some things as property which could not in law be regarded as such. The valuation of the charter as such was improper; it was improperly placed as a part of the capital stock of the company. The value of the charter could not form any item whatever in constituting its capital stock. But, as has been shown, dismissing that out of the case, there was still a valuation, as made by all the parties, which exceeded the hundred thousand dollars. We think, therefore, that corporators, in such a case as that, ought not to be made liable individually for the debts of the company, at the instance of creditors, because now, at a later day, the estimates fairly put upon the property at that time have become modified by subsequent events, and will not amount to the value which they set upon it. This does not assume that they have a right to fix any value they please; they must put an honest value, and, so far as the evidence in this case is concerned, we are brought to the conclusion that they did fix an honest value, to what they put into the concern. Certainly the corporation had no claim, and could have maintained none, against the corporators for this original subscription.

As to the new stock that was issued in May or June, 1874, it appears that the object of issuing the 4,000 shares as a dividend to the stockholders was to balance the amount of stock given to Howes for his land. They said: "Yes, we will give you 2,000 shares of stock for the land, provided it is balanced by 4,000 shares to the company, including the 1,000 shares already held. In other words, when that property is put into our concern we will give you one-third interest in the whole, 2,000 shares out of 6,000." (Of course, the other 4,000 belonging to them was to be sold to other parties.) Whereas, if they had given him 2,000 shares of stock without any such adjustment, it would have been giving him for his land two-thirds instead of one-third of the whole property of the company; that is, of the whole capital stock of the company. This they were

unwilling to do. Now it is true that they might have arranged that matter in a different way. They might have said: "We will give you 500 shares of additional stock for your land; then you will stand one-third to two-thirds—then you will have half as much stock as we." But that was probably not satisfactory to him. They entered into the agreement; they had conversed about it; they had talked it over; and he wanted a larger nominal amount, and they said: "If you have a larger nominal amount it must be balanced by more stock." That is evidently the nature of the transaction. I do not see any evidence of any intent to defraud anybody in such a transaction as that.

But there is the public. Have they not some rights if you make such a transaction as that? Certainly. And after that stock was increased to 6,000 shares, and 4,000 shares had been assigned to the associates in lieu of their 1,000 shares, there is no doubt that all the creditors becoming such after that time, and fairly to be presumed as calculating upon the amount of capital which the company was announced as having, must be held entitled to enforce the doctrine of the courts with regard to trusts. They did not advance any money for the additional 3,000 shares received, and they would probably be held bound as to such creditors to pay the amount of their stock. But even then, if it could be shown that this property was really worth 6,000 shares of stock, which was issued for it, there would be a question, there being no fraud and the stock representing only its value in property, whether they could be held liable. Still the evidence that it was not of that value, arising from the fact that Howes took 2,000 shares for the property acquired, would probably be conclusive that it was not, but that the arrangement was merely one of adjustment. But does that rule, with regard to holding the stockholders liable for the amount of these new shares, hold with regard to all the creditors of the company? Does it hold with regard to a party who is cognizant of the whole arrangement; who knows all about it, and who knows that the stock is issued as a dividend? Does it hold with regard to such a party, who receives a novation of his debt—of an old debt—and receives the same security for it that he had before? It seems to us that this would be unjust; that it would be a fraud on the stockholders, and not on the creditor.

We have looked at the evidence to see whether Mr. Coit, the plaintiff, was cognizant of the transaction and of its character, and we are brought to the conclusion that he was; that he knew all about it. He had his son there as an agent on the ground all the time, and had his superintendent there, who knew all about it, and we find that the

resolution for increasing the stock, which was undoubtedly passed after previous verbal communications between the parties, was passed on the eleventh day of May, 1874, authorizing the directors to issue the stock for the purpose of making this arrangement, and on the 18th, at an adjourned meeting, the directors passed their resolution to that effect. Then on the twentieth of May—right along in the same period —an agreement was entered into with Howes, for the purchase of his land, reciting the whole transaction; reciting that the previous mortgages—Coit's among the rest—were to stand as before, only Coit's to be surrendered and renewed. Then, on the twenty-sixth of May, part of the same transaction, comes the agreement with Coit that he will surrender his mortgage and take a new one, and give up the stock of the old company. That agreement is carried out on the twenty-sixth of July afterwards by his executing deeds to the company, and by their executing to him a mortgage. In the mean time, the stock that was to be issued was issued. The first certificate is dated July 3, 1874. It was during the latter half of May, and in June, that this whole transaction was going on. If a legal presumption did not arise that Mr. Coit knew of the transaction at that time, and there was no proof that he knew of it, it would present a different case. But we have evidence that he did know. Now what is that evidence? We have the evidence of Gen. Cram, who says, when asked to explain the connection of Mr. Coit with the company: "When the company purchased the Gold Hill mining estate of Howes, the company gave acceptances to Howes in part payment; one amounting to $1,000, payable in some months. This was transferred by Howes to Coit. At the time he purchased, Coit had held a second mortgage. In the terms for the purchase it was agreed between the company and Coit that Coit shall cancel his old mortgage and take a new one." And so on. Then Mr. Mitchell, who was intimately connected with the matter, says that Mr. Coit was perfectly familiar with all the transactions. "Mr. Coit was perfectly familar with the original formation of the company, and with the increase of the stock of the company to $1,000,000; he was a party to it, and the company could not, and would not, have purchased the Gold Hill property and increased its stock without his concurrence and consent. Mr. Coit, both personally and through his agent, was made acquainted with the designs, purposes, and intentions of the company in the purchase agreement. The agreement with him was to that effect; that he was to be placed afterwards in the same position," etc.

Now, unless this evidence is rebutted,—and Mr. Coit does not come forward to contradict it in the slightest degree,—unless this evidence is rebutted,—it seems to us perfectly clear that the conclusion must be deduced that Mr. Coit knew of this whole transaction, and acquiesced in it; and since he received the same security he had before, and perhaps an additional security,—because the agreement between him and the company says that he was to have all their new property, new buildings, etc., and the Mansion House,—how can he complain of of the issue of the stock? Under these circumstances, to make the stock, or the supposed subscriptions to the stock,—for the counsel is right in saying that stock issued to a party, which he receives, is the same as though he subscribed for it,—to make the stockholders liable personally to Mr. Coit, on the ground that it became a trust fund for his benefit, would be, instead of promoting justice, promoting injustice. It would enable Mr. Coit, by a mere trick of the law, to take money out of the pockets of these men which he never expected or relied on.

In deciding cases like this we must look into the nature of the transaction, the mutual relations of the parties, and the general habits of the business community in reference to transactions of this kind. We must not put strained and forced constructions upon the acts of parties which will promote the ends of injustice rather than those of justice. We are therefore brought to the conclusion on the whole case (and there is evidence to which we have not adverted) that this bill cannot be sustained, but must be dismissed.

We have thus merely indicated, in a conversational way, the general line of thought upon which we have based our conclusion, and have not thought it necessary to advert to other considerations tending in the same direction, such as the fact that the title to the land purchased of Howes could not be perfected, and the issue of new stock was revoked, and the parties reinstated to their original shares.

Bill dismissed.