RICKERSON ROLLER-MILL CO. et al. v. FARRELL FOUNDRY & MACHINE CO.

(Circuit Court of Appeals, Sixth Circuit. June 15, 1896.)

No. 386.

1. CORPORATIONS—ISSUE OF STOCK—SALE BELOW PAR.

When a corporation, not for the purpose of restoring its capital, impaired by losses in business, but for the purpose of providing new capital to carry on or extend its business, issues and sells stock at less than its par

value, the purchasers of such stock take the same subject to the contingency that, in the event of the insolvency of the corporation, they would be liable to creditors, who had become such in ignorance of the terms of their purchase, for the difference between the price actually paid for the stock and its par value. Handley v. Stutz, 11 Sup. Ct. 530, 139 U. S. 417, distinguished.

**2. SAME—RIGHTS OF CREDITORS.**
In the absence of statutory or charter provisions, however, a corporation may agree with a subscriber to its stock to receive less than the par value therefor; and a creditor of the corporation, who becomes such with knowledge of such an agreement between the corporation and the subscriber, cannot require the subscriber, upon the insolvency of the corporation, to pay his stock in full.

**3. SAME—INSOLVENCY—PREFERENCE TO DIRECTORS.**
While the mere insolvency of a corporation does not, either under general principles of law or the law of Michigan, render invalid a preference given, while insolvent, to its directors, who are also creditors of the corporation, yet, to sustain such a preference, the utmost good faith must appear, not only in respect to the bona fides of the debt paid, but in respect to all the steps taken to secure the preference. Accordingly, *held*, that where three directors, who constituted a majority of the board, and whose votes were necessary to the action taken, transferred to themselves, in payment of an antecedent debt, all the available assets of the corporation, though they had previously assured a creditor that his claim should be paid before that of the directors, the preference so obtained by the directors was invalid, and the assets so transferred to the directors should be ratably distributed among all the creditors of the corporation.

**4. APPLICATION OF PAYMENTS.**
When a creditor attempts to show that payments made upon an open, running account have been applied neither to the oldest items of such account, according to the presumption of law where no specific application is made, nor to the latest items, but in part to both, leaving unpaid certain items in the middle of the account, for which a party could be held who could not be held for earlier or later items, the burden to establish such an application of payments rests very heavily upon such creditor, and is not sustained by a coincidence of the amount of such items with the amount of the balance, nor by the existence of unexplained pencil memoranda on the margin of a book account which on its face gives no support to the claim.

Appeal from the Circuit Court of the United States for the Western District of Michigan, Southern Division.

The original bill was filed by the Farrell Foundry & Machine Company, as a judgment creditor of the Rickerson Roller-Mill Company, a corporation of the state of Michigan. The bill sought relief upon two distinct grounds: First, that there was an unpaid stock subscription made by the individual defendants, E. C. and Charles Fox, which was subject to call by a court of equity at the instance of a judgment creditor whose execution had been returned nulla bona: second, that the individual defendants, the Messrs. Fox as directors and officers of the Rickerson Roller-Mill Company, had converted to their individual use equitable assets of the corporation, for the purpose of paying debts due from it to them, or debts due by it to others, upon which they were bound as sureties, and which conversion, it was alleged, was invalid as against complainant. There was a decree against the Messrs. Fox upon both grounds. In November, 1882, one S. B. Rickerson made application for a patent for certain improvements in roller mills. Pending this application he interested certain others therein; among them, O. E. Brown. The persons thus associated with Mr. Rickerson in the ownership of the proposed patent organized themselves into a corporation, under the general law of the state of Michigan, known as the O. E. Brown Manufacturing Company. The articles of incorporation were recorded December 15, 1882, and, among other things, recited that the paid-up capital stock of the corporation was $100,000, divided into shares of $25 each; that the number of shares taken, owned,

and fully paid up was as follows: S. B. Rickerson, 2,000; O. E. Brown, 1,600; S. W. Ousterhout, 200; and James L. Wheeler, 200. The corporation, it was recited, was established for the purpose of "manufacturing the S. B. Rickerson patent improved roller mill and other mill machinery, and furnishing and dealing in mill machinery, and such other property of every kind as shall be necessary for the purpose of said corporation." On the 1st day of March, 1883, at a meeting of the stockholders of the said O. E. Brown Manufacturing Company, it was resolved that "the capital stock of this corporation be, and is hereby, increased from $100,000 to $150,000." On the same day, at a stockholders' meeting, the following resolution was carried unanimously:

"Moved by Mr. Rickerson, and supported by Mr. Ousterhout, that the treasurer be authorized to sell to Messrs. E. Crofton and Charles Fox the additional $50,000 stock, $25,000 each,—payment to be made as agreed,—for the sum of $25,000. Carried. Moved by Mr. Ousterhout that a ballot be cast for two directors. Carried. Messrs. E. Crofton and Charles Fox were elected.

"[Signed]                                        Charles Fox, Secretary."

On the same day the following agreement purports to have been entered into and signed:

"Agreement made and entered into this 1st day of March, 1883, between S. B. Rickerson, of Grand Rapids, Mich., party of the first part, and O. E. Brown Manufacturing Company, of the same place, of the second part, witnesseth, in consideration of the stock now owned by the party of the first part in the O. E. Brown Manufacturing Company, the first party agrees that all inventions, improvements, or patents in any wise pertaining to the manufacturing of flour, or any machinery for the manufacturing of flour, shall be the property of, and belong to, the said O. E. Brown Manufacturing Company.

"S. B. Rickerson.

"O. E. Brown Mfg. Co.,

"O. E. Brown, President."

Following this increase in stock, and the authority given the treasurer to sell the same for $25,000 in money, Messrs. E. C. Fox and Charles Fox became the purchasers and holders of the entire increased stock, of the par value of $50,000, paying therefor to the treasurer of the company the sum of $25,000, which sum was accepted by the corporation as full payment for the said stock; and certificates were issued, representing that the stock was fully paid up, and liable to no other or further assessments. The original stock, of $100,000, was issued to Rickerson and his associates, in the proportion heretofore stated, as fully paid and nonassessable stock; the only consideration received therefor being the assignment by Rickerson of his rights in any patents, then or thereafter applied for, applicable to roller mills. Thus the corporation began its operations with no capital, save that invested in the Rickerson patents. The necessity for an increase of capital was, from the beginning, recognized; and negotiations were immediately commenced with the Messrs. Fox, looking to their taking a one-third interest in the venture. In the meantime some machines were made under contracts with other manufacturing establishments, and orders taken for those thus made, though no effort was made to commence manufacturing operations, for the want of a cash capital. When the Fox brothers finally concluded to enter upon the adventure and take a third interest, the purpose was consummated by increasing the stock to $150,000, and assigning to them the new shares for $25,000 in money. This increase was authorized March 1, 1883; and on the same day the stock was assigned to E. C. Fox and Charles Fox,—$25,000 to each,—upon a money payment to the corporation of $12,500 by each of them, and on the same day each was made a member of the board of directors. In May, 1883, an account was opened with the Farrell Foundry & Machine Company, from whom were purchased large amounts of rolls used in the manufacture of the improved Rickerson roller mill. This account began May 5, 1883, and continued until the 16th of July, 1887, during which time rolls to the amount of $61,148.31 were purchased. From time to time payments were made thereon, or settlements by note or draft, so that in the summer of 1887 the total credits upon this account were $60,148.31, leaving a balance due on open account of $1,000. The judgment in favor of the Farrell Company was

upon three items of indebtedness: A note dated March 31, 1887, for $1,065; a note dated August 18, 1887, for $670, and $1,000, the balance due on open account as above shown. The bill alleges that this judgment is a debt of the corporation, for which the Messrs. Fox are liable by reason of the fact that they have paid but 50 per cent. of the par value of the stock taken in the manner heretofore set out. With respect to the second ground of liability, the facts, as they appear to us upon the whole record, and necessary to be here stated, are these: The business of the Rickerson Roller-Mill Company proved unprofitable. The patents turned out to be practically worthless, and the cash capital utterly insufficient for the projected business. It was therefore resolved early in July, 1887, that the business of the corporation was unprofitable, and that it was to the interest of all parties concerned that the assets of the company should be disposed of. Shortly thereafter all of the tangible assets of the corporation, and all unfinished machines, and all material, were sold to the John Hutchison Manufacturing Company for 4,000 shares of the stock of that company, the shares being of the nominal value of $25 each. Having thus disposed of its assets, excepting a few uncollected accounts, this stock was assigned and transferred to three of the directors,—S. W. Ousterhout, E. C. Fox, and Charles Fox,—on the 10th of October, 1887, to secure them in the indorsement of corporation paper upon which to raise money to discharge corporate obligations which had shortly before gone to protest. This stock was subsequently sold by these directors at public outcry, and bought in by themselves, for $1,000, and the proceeds applied to their reimbursement; they having theretofore paid off the $10,000 note, as indorsers for the corporation. The remaining assets of the corporation, consisting of certain uncollected claims, partly in litigation, were transferred by the corporation in May, 1888, to Ousterhout, E. C. Fox, and Charles Fox, to be applied on the liability of the corporation to them by reason of their payment of the note above mentioned. At the date of the transfer of the John Hutchison Manufacturing Company stock to Ousterhout and the Fox brothers, they were already bound as indorsers upon corporation paper theretofore made, which had gone to protest. The new note of October, 1887, was made for the purpose of paying off this old liability, which, by protest, had become a fixed liability of these directors.

Albert Crane, for appellants.
A. C. Denison, for appellee.

Before TAFT and LURTON, Circuit Judges, and HAMMOND, J.

LURTON, Circuit Judge, after making the foregoing statement of facts, delivered the opinion of the court.

The first defense made by the Messrs. Fox to their liability as unpaid subscribers to the capital stock of the Rickerson Roller-Mill Company is that they never were in fact subscribers for said stock, but that it was in reality issued to S. B. Rickerson and his associates as a further consideration for the patents theretofore applied for, and such as should thereafter be obtained, pertaining to roller-mill machinery, and that they purchased this stock, as fully paid up stock from Rickerson and his associates, who had received it in consideration of the property sold and transferred to the corporation. This defense is unsupported by the circumstances. Rickerson had theretofore agreed to transfer to this corporation all pending applications, as well as all applications which he should thereafter make, for and in consideration of the entire capital stock, of $100,000. The increase of stock was solely for the purpose of obtaining additional capital, to the end that the business of the company might be increased, and put on such a footing as would give the project some hope of success. The increase stock was, by resolu-

tion, treated as treasury stock, and ordered to be sold by the treasurer of the company. It was thus sold, and the proceeds, instead of being paid over to Rickerson and his associates, were paid into the treasury of the company, as capital stock of the company. The assignment by Rickerson, of March 1, 1883, heretofore set out, was in accordance with the agreement originally made with him, and was no broader than originally contemplated.

The second defense is that this increase of stock was for the purpose of restoring the impaired capital of the Rickerson Roller-Mill Company; that the case was that of a going, active corporation, whose capital had become impaired, and whose stock was, on the market, worth only 50 cents on the dollar; and that, as the stock was actually sold in good faith for its actual market value, neither the corporation nor its creditors are injured, and neither can call upon such a purchaser for the difference between the sum actually paid and the par of the stock. For this counsel cite Handley v. Stutz, 139 U. S. 417, 11 Sup. Ct. 530; Clark v. Bever, 139 U. S. 96, 11 Sup. Ct. 468; Fogg v. Blair, 139 U. S. 118, 11 Sup. Ct. 476; Morrow v. Steel Co., 87 Tenn. 262, 10 S. W. 495; Young v. Iron Co., 65 Mich. 111, 31 N. W. 814. Were the circumstances such as to enable a purchaser of these increased shares to buy them from the company at less than their par value without incurring a liability to the creditors for the difference between the par of the stock and the price actually paid? The case for decision certainly differs most materially from Clark v. Bever and Fogg v. Blair. These shares were not, as in those cases, the shares of an insolvent corporation, received by a creditor, in payment and discharge of his debt, at less than par, and at a value in excess of the actual market value. In neither of the cases above referred to was the stock taken in any sense as an investment, or for the purpose of enabling the company to enlarge or increase its business, but was accepted by the creditor, in each instance, as the best settlement obtainable from an insolvent corporation. Neither is this the case of a going corporation, whose capital stock had become impaired or diminished by losses or misfortunes. It is true that in some sense this corporation had been doing business in a small way for a month or more before this new stock was issued, but there is no evidence that its capital stock had been impaired by losses. Upon the contrary, the Messrs. Fox were admitted as shareholders in consequence of the necessity for increasing the capital stock of the company, and enabling it to begin the business for which it had been organized. Their purchase of these shares was in accordance with the original scheme of the promoters, and they were bought as an investment in a manufacturing corporation which had not yet acquired a plant, or begun the business for which it had been organized. The arrangement by which they were to buy these shares from the corporation, and pay but 50 per cent. of the par value of the stock, was subject to the contingency that they would be liable, in the event of the insolvency of the corporation, to creditors who should become such in ignorance of the arrangement, and who had a right to suppose that this increased stock had been paid in full, or was subject to call. The stock taken by

Rickerson and his original associates stands upon a very different footing. That was issued in payment for the Rickerson patents, upon a value estimated by the parties to be fair and reasonable. When full-paid stock is issued by a corporation having power to receive property in payment for stock subscriptions, there must be actual fraud in the transaction, to authorize creditors of the corporation to call upon the subscriber for the difference between the actual value and that at which it was received. Coit v. Amalgamating Co., 119 U. S. 343–345, 7 Sup. Ct. 231; Young v. Iron Co., 65 Mich. 111, 31 N. W. 814. A gross and obvious overvaluation of property would be strong evidence of fraud. Coit v. Amalgamating Co., cited above; Boynton v. Hatch, 47 N. Y. 225; Kelley v. Fletcher, 94 Tenn. 1–6, 28 S. W. 1099. A creditor seeking to compel a subscriber who has received nonassessable stock in payment for property transferred must, in his pleadings, distinctly aver the colorable character of the transaction. Jones v. Whitworth, 94 Tenn. 602, 30 S. W. 736. So a stockholder paying his stock subscription in property at an agreed value is not liable in equity to a creditor of the corporation, who had knowledge of and assented to the transaction at the time when it took place, solely upon the ground that the real value turned out to be less than was agreed upon. Bank v. Alden, 129 U. S. 372, 9 Sup. Ct. 332. In Handley v. Stutz, heretofore cited, the facts were that the capital of a going concern had, by losses, become impaired so that both its actual and market value were much below par. The court in that case held that under such circumstances the sale of increase stock, in good faith, at its actual value, operated neither as a fraud upon the corporation nor upon existing or future creditors. In the subsequent case of Camden v. Stuart, 144 U. S. 104, 113, 12 Sup. Ct. 585, Justice Brown, who announced the opinion of the court in Handley v. Stutz, reasserted the doctrine—

"That the trust arising in favor of creditors by subscriptions to the stock of a corporation cannot be defeated by a simulated payment of such subscription, nor by any device short of an actual payment in good faith."

Touching the case of Clark v. Bever, 139 U. S. 96, 11 Sup. Ct. 468, and Fogg v. Blair, 139 U. S. 118, 11 Sup. Ct. 476, and Handley v. Stutz, 139 U. S. 417, 11 Sup. Ct. 530, the learned justice said that nothing was said in those cases—

"Intended to overrule or qualify in any way the wholesome principle adopted by this court in the earlier cases, especially as applied to the original subscribers to stock. The later cases were only intended to draw a line beyond which the court was unwilling to go in affixing a liability upon those who have purchased stock of the corporation, or taken it in good faith in satisfaction of their demands."

The opinion in Handley v. Stutz carefully excludes a sale of stock under the circumstances we have here to deal with, by saying:

"The liability of a subscriber for the par value of increased stock taken by him may depend somewhat upon the circumstances under which, and the purposes for which, such increase was made. If it be merely for the purpose of adding to the original capital stock of the corporation, and enabling it to do a larger and more profitable business, such subscriber would stand practically upon the same basis as a subscriber to the original capital. But we think that an active corporation may, for the purpose of

paying its debts and obtaining money for the successful prosecution of its business, issue its stock, and dispose of it for the best price that can be obtained."

On the facts of this case, we hold that this increase of stock was merely for the purpose of increasing the capital and. enabling the corporation to do business, and that this was well understood by the Messrs. Fox when they agreed to purchase the same. We see no reason why it should not stand upon the footing of original stock.

It is next said, that the Farrell Foundry Company had full notice of the terms and conditions of the sale of this increased stock to the Messrs. Fox, and extended credit thereafter with such knowledge, and are therefore not entitled to call upon them to contribute towards the payment of the debt thus created. The evidence establishes that early in February, 1884, the creditor corporation received full notice of the fact that $100,000 of the stock of this corporation had been issued to Rickerson and his associates in payment for their patent rights, and that the increase of $50,000 had been issued to the Messrs. Fox, as paid-up stock and nonassessable, for $25,000. Being thus fully cognizant of the fact that the actual capital of this corporation consisted in patent rights of unknown value, and $25,000 in money, they continued to extend credit to it. When credit is extended to a corporation with full knowledge of special arrangements between the corporation and purchasers of the stock whereby nonassessable stock has been issued for less than its par value, it cannot be said that such credit has been extended in reliance that the stock has been fully paid, or is subject to further calls by the corporation. In the absence of statutory or charter provisions, such as approved in Morrow v. Steel Co., heretofore cited, requiring original stock subscriptions to be paid in full, there is no reason why the corporation should not be concluded by its contract to receive less than par in full payment for stock subscribed or sold. Such an agreement, though binding upon the corporation, is not valid as to creditors who become such in actual or presumed reliance that the capital stock is in fact what it is represented as being. Sawyer v. Hoag, 17 Wall. 610; Scovill v. Thayer, 105 U. S. 143. The ground upon which such special arrangements between a corporation and its stockholders are invalid as against creditors was thus stated in Scovill v. Thayer:

"But the doctrine of this court is that such a contract, though binding on the company, is a fraud, in law, on its creditors, which they can set aside; that when their rights intervened, and their claims are to be satisfied, the stockholders can be required to pay their stock in full. The reason is that the stock subscribed is considered in equity as a trust fund for the payment of creditors. It is so held out to the public, who have no means of knowing the private contracts made between the corporation and its stockholders. The creditor has therefore the right to presume that the stock subscribed has been or will be paid up, and, if it is not, a court of equity will, at his instance, require it to be paid."

In the subsequent case of Handley v. Stutz, heretofore cited, the court held that none but subsequent creditors could call upon such a special subscriber to pay the difference between his actual payment and the par value of his stock, "since it is only they who could,

by any legal presumption, have trusted the company upon the faith of the increased stock." First Nat. Bank of Deadwood v. Gustin Minerva Consol. Co., 42 Minn. 327, 44 N. W. 198; 2 Mor. Priv. Corp. §§ 832, 833; Coit v. Amalgamating Co., 14 Fed. 12; Young v. Iron Co., 65 Mich. 111, 31 N. W. 814; Whitehill v. Jacobs, 75 Wis. 474, 44 N. W. 630; Walburn v. Chenault, 43 Kan. 352, 23 Pac. 657; Robinson v. Bidwell, 22 Cal. 379; Beach, Priv. Corp. § 119.

But it is said that the items of indebtedness for which the complainants' judgment was rendered consist in large part of debt contracted prior to notice of the terms and conditions upon which the Messrs. Fox acquired their shares, and that for this reason the decree against them should be affirmed. The items upon which the judgment was rendered were three in number, as follows: (1) A balance due upon open, general account, of $1,000; (2) a note made May 23, 1887, for $1,065; (3) a note made August 18, 1887, for $670. Confessedly, the last note was made for the last five items of account, and represents credit extended in June and July, 1887. This part of the judgment was therefore properly held not to be collectible from the Messrs. Fox as holders of unpaid shares. Do the other items represent credit extended prior to February, 1884? The account against the Rickerson Company, as it appears on the books of both corporations, is a continuous, running account, embracing a large number of distinct purchases of rolls used in the construction of the Rickerson Roller Mills. This account began in May, 1883, and the last item of charge is of July, 1887. The aggregate of the debit items is $61,148.31. The credit items do not consist of money payments on account, as might be supposed, but of notes and drafts made in partial settlement from time to time. The aggregate of these credits is $60,148.31. The difference between the two sides of the account is $1,000, and this debit balance constitutes one of the items which entered into the judgment obtained by the Farrell Company. The note of May 23, 1887, for $1,065, is one of the credit items in the account we have referred to. The contention now is that this note, and the $1,000 due by open account, represent credit extended, not at the foot of the account, nor at the head of the account, but credit extended just before January 1, 1884. In other words, the contention is that payments by note and draft were so applied upon the current account as that all of the account originating after notice of the terms of the stock sale to Messrs. Fox has been paid off, and that which remains unpaid consists wholly of items originating just prior to such notice. The face of the book accounts of neither of the corporations indicates any such settlements or applications of payments as claimed. The evidence outside of the book entries does, however, tend to show that about March 18, 1884, Mr. Charles Fox took personal charge and management of the business of the Rickerson Company. The account of the Farrell Company shows that at that date there was a balance due from the Rickerson Company of $17,773.70. The evidence also tends to show that from the time Fox assumed the management this balance of debt, in the correspondence and dealings between the parties, was referred to as the "old account." So it seems to be shown that Fox

undertook to support the credit of the company, after it came under his management, by promptly meeting new engagements, and that the purchases thereafter made were sometimes spoken of as the "new account." After March 18, 1887, new purchases were settled for by notes or drafts executed in settlements from time to time, although the book accounts, on their face, show no such separation of the account. If we assume that a line was drawn between the account prior to the change in management of March, 1884, and the subsequent account, and that payments were thereafter applied sometimes to the "old account," and sometimes to the "new account," how will the matter stand? The contention of the complainants is that thereafter all of the "new account" was paid, except so much thereof as is represented by the note for $670, heretofore mentioned, and that all of the "old account" was paid, except $2,065. If we assume that this is made out satisfactorily, we are then confronted with the question as to whether this balance of $2,065 belongs to the head or foot of this "old account." If to the head, then it stands for credit extended before notice of the terms of the stock sale to the Messrs. Fox; while, if it is a balance at the foot of that account, it is for rolls sold after such notice. This conclusion is based upon the assumption that the Farrell Company obtained information as to the terms of stock sale to the Messrs. Fox as early as the 13th of February, 1884. The purchases made between February 13, 1884, and March 18, 1884, amounted to more than $5,000, and the balance due would presumptively be for the last items in this "old account." To escape this dilemma, counsel have contended that the particular items represented by the balance unpaid on the "old account" stand neither at the head nor foot of the "old account," but consist in credit extended just prior to January 1, 1884; being the items at the foot of an account ending January 1, 1884. Where payments are made upon an open, running account, and the parties at the time make no application of such payments to particular items of the account, the law will apply them to the oldest items of the account; that is, such payments will be applied to the head, rather than the foot, of the account. Devaynes v. Noble, 1 Mer. 597–608; U. S. v. Kirkpatrick, 9 Wheat. 720; Crompton v. Pratt, 105 Mass. 255; National Park Bank v. Seaboard Bank, 114 N. Y. 28, 20 N. E. 632. As we have before stated, the book entries of neither of the corporations show any distinction whatever between the accounts before and after the change of management in March, 1884. Neither do the books give any countenance to the claim now advanced, that payments upon the "old account" were applied in so arbitrary a way as now suggested. No conceivable reason exists why items of indebtedness originating between January 1, 1884, and March 18, 1884, should be carefully paid off by note or draft, leaving both antecedent and subsequent parts of the same account unpaid or unsettled. To support the theory that the balance which is due originated before January 1, 1884, counsel have made use of certain pencil memoranda found on the margin of the ledger account kept by the Rickerson Company. With the aid of these unexplained, penciled figures, and by transferring certain credit items from January, 1884, to December, 1883, a

correspondence has been found between the aggregate of the purchases between January 1, 1884, and March 18, 1884, and certain notes executed in March and April, 1884. The coincidence and correspondence resulting from this manipulation of certain parts of this account are not satisfactory, and, in our judgment, do not overcome the presumption that payments made on the "old account" were intended to be applied, and were applied, to the head of the "old account." There was no reason for such an arbitrary mode of applying a payment. To say the least, it is remarkable that a creditor should say, "The sum you owe me is not the balance at the foot of the account, neither is it a balance from the head of the account, but is for items found neither at the head nor foot, but for credit extended at a particular period of the account just before I learned certain facts which preclude me from looking to you for credit extended after the particular time and place in the account where I now locate my claim." The burden to establish such a peculiar balance rests very heavily upon the creditor, and in this case has not been met. We are more satisfied with this conclusion from the fact that the original bill, for the evident purpose of getting the benefit of an admission as to unpaid stock found in the annual statement of the Rickerson Company filed in January, 1886, averred that the balance of debt now in controversy accrued after the filing of that statement. The exigencies of the case have compelled a shifting of the date of origin, and, while not disposed to treat the averment of the bill as a technical estoppel, it must add much weight to the presumption against so erratic an application of payments as that now urged. The claim is much like that presented by Clayton's case, in Devaynes v. Noble, 1 Mer. 608, where the rule of application of payments to a running banker's account was sought to be evaded so as to leave a balance due as originating at a time when a deceased partner might be held liable. Sir William Grant, M. R., said of such a claim:

"In such a case there is no room for any other appropriation than that which arises from the order in which the receipts and payments take place, and are carried into the account. Presumably, it is the sum first paid in that is first drawn out. It is the first item on the debit side of the account that is discharged or reduced by the first item on the credit side. The appropriation is made by the very act of setting the two items against each other. Upon that principle all accounts current are settled, and particularly cash accounts. When there has been a continuation of dealings, in what way can it be ascertained whether the specific balance due on a given day has or has not been discharged, but by examining whether payments to the amount of that balance appear by the account to have been made? You are not to take the account backward, and strike the balance at the head instead of the foot of it. A man's bank breaks, owing him, on the whole account, a balance of 1,000 pounds. It would surprise one to hear the customer say: 'I have been fortunate enough to draw out all that I paid in during the last four years, but there is 1,000 pounds, which I paid in five years ago, that I hold myself never to have drawn out; and therefore, if I can find anybody who was answerable for the debts of the banking house, such as they stood five years ago, I have a right to say that it is that specific sum which is still due to me, and not the 1,000 pounds that I paid in last week.' This is exactly the nature of the present claim. Mr. Clayton travels back into the account, till he finds a balance for which Mr. Devaynes was responsible; and then he says: 'That is a sum which I have never drawn for. Though standing in the center of the account, it is to be con-

sidered as set apart, and left untouched. Sums above it and below it have been drawn out, but none of my drafts ever reached or affected this remnant of the balance due me at Mr. Devaynes' death.' What boundary would there be to this method of remolding an account? If the interest of the creditor required it, he might just as well go still further back, and arbitrarily single out any balance, as it stood at any time, and say it is the identical balance of that day, which still remains due to him."

The decree must be reversed so far as the Messrs. Fox are held liable for any part of the debt due to the Farrell Company as holders of shares not fully paid up.

This brings us to the second ground upon which a decree against C. E. and Charles Fox is sought, namely, that they should account for certain corporate assets in their possession, which they claim under assignments by the corporation to them, either to protect them against liability as indorsers upon corporation paper, or in part payment for corporate liabilities paid off by them as indorsers. It is said that the allegations of the bill in respect to this aspect of the relief sought are not sufficient to support the decree. The bill, after stating that the assets of the corporation had been sold by the defendants Fox, charged, upon information and belief—

"That the proceeds of the assets so sold and disposed of were by said defendants Fox applied to their own use and benefit, either by direct conversion, or by applying the same upon debts upon which they were personally liable; but the extent and particulars of such application your orator is not able at this time to state."

The prayer is that they account for all such assets so applied to their individual use. The answer sets out the circumstances under which the individual defendants had become possessed of the proceeds of the sale of the corporate property, and subsequently of the uncollected claims due to the corporation. These facts have been already stated, and need not be repeated. The pleadings sufficiently involve the title and right of the Messrs. Fox to the corporate assets in their possession, and, under the evidence, it devolves upon us to determine whether they shall be permitted to appropriate these assets to their exclusive benefit. That they were, at the time of the assignment of these assets, creditors of the corporation, we have no doubt. The question is, are they entitled to retain the preference thus secured? As we have already stated, the directors securing the preference of the 10th of October, 1887, did not then incur any new liability, or extend in any way the life or business of the company. They were already liable as indorsers upon company paper which had gone to protest. The new note was indorsed and discounted to obtain means to pay off the protested notes. Thus, no new liability was incurred, and no new benefit moved to the corporation. It was at that time in process of liquidation, and owned no property save this stock, and some uncollected accounts of little or no value. What was done, therefore, by the directors, was to prefer three of their own members as creditors of an insolvent corporation, which had ceased to do business, and had disposed of its property for the purpose of winding up. It is said, in support of the title of the Fox brothers to these corporate assets, that although the corporation was not a going concern, and was in process of liq-

uidation, the corporation was still in the actual possession of these assets, and had the same dominion over them that it at all times had had, and that if the corporation, at any time before a general assignment, or the seizing of the assets under a general creditors' bill, choose to pay one creditor and leave another unpaid, or prefer one creditor over another, it may do so as freely as an individual could. This general proposition may be conceded, without settling the question here presented. The preference here given was to the individuals owning practically the entire stock, and constituting three-fourths of the board of directors. The votes of the directors thus preferred were essential to consummate this preference. There was no submission of the matter to the shareholders as such. Possibly, this is unimportant, inasmuch as the shareholders, at the date of these preferences, were identical with the directors, as the latter, with one minor and nominal exception, were identical with the creditors preferred. In the case of Brown v. Furniture Co., 16 U. S. App. 221, 7 C. C. A. 225, and 58 Fed. 286, this court had occasion to consider the validity of mortgages made by an insolvent corporation of the state of Michigan, which gave a preference to directors who were guarantors and indorsers for the corporation. The mere fact that the corporation was insolvent, and the mortgagees were directors, was held not necessarily to render the preference invalid, under either general principles of law, or the law of Michigan, the state in which the mortgages were made. Bank of Montreal v. J. E. Potts Salt & Lumber Co., 90 Mich. 345, 350, 51 N. W. 512. This court has not adopted the theory that the assets of a corporation become a trust fund in the hands of its directors, for equal distribution among all creditors upon the occurrence of insolvency. If creditors choose to permit the officers and directors of an insolvent corporation to remain in possession and control of the assets, we do not see upon what principle the mere fact of insolvency is to operate as an injunction against any creditor from obtaining a preference through legal processes, or by agreement with the corporation. If such a corporation may prefer a stranger who is a creditor, it may likewise prefer one of the corporators. In the latter case, however, the utmost good faith must appear, not only in respect of the bona fides of the debt paid or secured, but in regard to all the steps taken to secure the preference. In the case before us the preference is given to persons who at the time constituted three-fourths of the directors who assented to the arrangement. These directors had been allowed to remain in possession of the corporate assets under very peculiar circumstances. The Farrell Company had been an indulgent creditor. But in the spring of 1886 it became impatient, and by a letter dated March 1, 1886, threatened to place its claim in process of collection. To this the Rickerson Company replied, under date of March 4, 1886, as follows:

"We note what you say in regard to sending the account here to be collected, and can simply state that we would very much regret any such action on your part. However, if it is your firm determination to do so, we see no way in which we can prevent you. Neither do we see any way whereby you could any sooner obtain your money. If you consider that you can

obtain your money any sooner by taking the rolls we have on hand, we would be perfectly willing that you should do so. We, however, cannot see any way to pay you the amount until the rolls we have on hand are turned into money. This we have made arrangements to do, as we wrote you before; having made a contract with responsible parties to manufacture our machines, and parties who will use them themselves, from twenty to thirty machines a month easily, upon which we make a good profit, and which will enable us to turn our present stock so that we will be able to get ready money wherewith to pay our indebtedness. We hope you will take such a view of the matter as will cause no inconvenience or loss to yourselves or ourselves, as we cannot see any good results that will come through such action."

To this, among other things, the Farrell Company, under date of March 8, 1886, replied by submitting the following proposition:

"Let us have your paper for one-half the amount at ninety days, and we will agree to let the rest run along until that is cared for, or for longer; say, four to six months, if necessary. We want something, and want it now. It is asking too much to expect us to hold off on the entire thing in this way. We will do what is fair and right, only we want you to do something for us now. Please advise us at once what you will do about it, and oblige."

Under date of March 17, 1886, the Rickerson Company, through a letter written by the defendant Charles Fox, replied, among other things, as follows:

"We expect to be able to settle your account due you, and we intend to do so. We cannot say just when that will be, as that depends upon how soon we can realize upon the stock of rolls and machines which we have on hand; but, as we told you before, we shall reduce your claim as fast as we realize upon said stock. All we owe of any consequence is to you and the bank. The bank obligations have been carried some time, and have some personal indorsements, and it is our intention and desire to settle your claim before we pay those of the bank. We wish to treat you fairly in every way, and we think this is certainly the fairest thing we can do. We feel very grateful towards you for the accommodations you have granted us, and we do not wish to see you lose a dollar through this company. It appears to us that we can realize on the rolls and machinery which we have on hand to better advantage by continuing the business than could be realized if the business should be stopped or closed up on any execution, as this class of machinery is not such as could be sold to any advantage whatever at public sale. We should dislike very much to have you bring suit against us for your account, as it would embarrass the institution still further, and work disadvantageously to all interested, in every way. We realize that this matter is somewhat unbusinesslike, and extremely tedious, to say the least; but our personal experience has been that it is often better to nurse a lame duck than to crowd it too hard, and more profitable in the end. We hope you will still feel as though you could nurse this duck for a while longer, and we will keep you posted in the affairs of the institution as you may desire from time to time, so that you may know that your interests are not being jeopardized by allowing the business to continue. Hoping that we shall hear from you, we remain, yours, very truly."

The Farrell Company replied as follows:

"Ansonia, Conn., March 20, 1886.

"The Rickerson Roller-Mill Company, Grand Rapids, Mich.—Gentlemen: Your favor of the 17th inst. is to hand, and noted. Do we understand that you have already perfected arrangements for continuing the building of your mill? The arrangements you had in mind have fallen through, we believe. We refer to the one you had in mind when the writer was West. If you have already made arrangements to continue the business, we would perhaps be willing to wait a while longer; that is, if you can see any likelihood that the matter will be closed up within a few months. We are no more anxious to have any trouble than you are yourselves, and would request that you enlighten us on this point. We remain, yours, truly."

In reply the Rickerson Company, under date of March 27, 1886, said, in substance, that they had made arrangements with a firm at Sandusky to manufacture their machines, using in them the rolls owned by the Rickerson Company in stock. The hope of thus utilizing material on hand profitably induced an expression of opinion that their prospects were good for being able to pay for that material within a reasonable time. This closed the correspondence. The Farrell Company did not further press its claim. It in fact extended further indulgence, in the natural belief that the bank obligations, "with personal indorsements," would not be paid or preferred after a direct statement that it was "the intention and desire to settle your claim before we pay those of the bank." The bank obligations referred to in this letter of March 17, 1886, were the claims upon which Charles and E. C. Fox were personal indorsers. Those claims, by renewals, were kept alive until October 10, 1887, when these indorsers, taking advantage of their continued possession of the corporate assets, had assigned to themselves all the assets of the company, to secure them as indorsers of the very claims which they had represented should be postponed to the claim of the Farrell Company. That the Farrell Company did not embody the proposition to pay its claim in preference to this "bank claim" in a contract, or did not, in so many words, say, "We extend time upon condition that you will do as you propose," seems to us not to be an answer to the insistence that these directors could not in good faith prefer themselves after inducing forbearance by assurances of the utmost fairness in the use of the corporate assets to pay outside creditors. Under such circumstances, it is not enough for directors taking a preference out of the assets of an insolvent corporation to establish the fact of the debt due to themselves. They secured the opportunity to prefer themselves by assurances that they would not do so. Their doing so in violation of the moral trust they solicited was bad faith, and the assets thus secured should be ratably administered among all the creditors; including, however, the preferred directors. This meets the justice of the case, upon the peculiar facts of this record. The decree upon this branch of the case will be affirmed. The costs of appeal will be equally divided.