## GUINNESS *v.* REMICK.

1. CORPORATIONS—CAPITAL STOCK HELD FOR BENEFIT OF CREDITORS.
    The capital stock of a corporation is the property of the corporation, a trust fund for the benefit of the corporation and its creditors, and creditors have a right to rely on such capital stock in extending credit to the corporation.[1]

2. SAME—CREDITORS KNOWING THAT STOCK HAS BEEN ISSUED TO STOCKHOLDERS MAY NOT RELY ON IT AS PROPERTY OF CORPORATION.
    Where a realty company, at the time it made a contract leasing certain property to a corporation, knew that the capital stock of said corporation had been issued to the stockholders as fully paid and nonassessable, and had access to its books and records, and was advised of the specific property held by the corporation as a consideration for said stock, it cannot be said to have relied on the fact that the capital stock in question was in the treasury of the corporation and a security to it for performance of the contract, and, therefore, it is not in position to require individual stockholders to satisfy its demand on the ground that said stock had been issued to them without payment having been made to the corporation therefor.[2]

Appeal from Wayne; Carr (Leland W.), J., presiding. Submitted June 13, 1924. (Docket No. 75.) Decided October 6, 1924.

Bill by Denton Guinness, receiver of the United Amusement Company, against Jerome H. Remick, executor of the estate of George B. Remick, deceased, and others, original stockholders in said corporation, to require the payment of certain judgments. From a decree for plaintiff, defendants appeal. Reversed, and bill dismissed.

[1]Corporations, 14 C. J. § 1476; [2]Id., 14 C. J. § 1544.

*Robert M. Brownson,* for plaintiff.

*Miller, Canfield, Paddock & Stone,* for defendant Remick.

*Anderson, Wilcox, Lacy & Lawson* and *Harold A. Sleeper* (*Arthur J. Lacy* and *Ward H. Peck,* of counsel), for other defendants.

SHARPE, J.   In November, 1915, the Stott Realty Company recovered a judgment against the United Amusement Company in the sum of $15,769.26 and costs, which was affirmed by this court (195 Mich· 684).  In January, 1919, a second judgment was recovered in an action between the same parties for $42,716.54.   Writs of execution were issued on these judgments and returned, the first partially satisfied and the second wholly unsatisfied.

The plaintiff was appointed receiver of the amusement company on May 6, 1918, pursuant to sections 13378-13392, 3 Comp. Laws 1915.   As such receiver he filed bills of complaint, praying that the individual defendants be required to pay to him such sums as were necessary to satisfy such judgments, for the reason that certain stock of the amusement company had been issued to them without payment having been made to the company therefor.   From decrees rendered in favor of plaintiff, the defendants appeal. The two cases were heard together in the circuit, and have been submitted as one case on appeal.

A somewhat extended history of the transaction in which the parties engaged seems necessary to a proper understanding of the issue presented.   Early in the summer of 1912, John F. Lawrence, George B. Remick, Hermann Dey, Frederick C. Anger, Charles A. Posey and Harold D. VanNorman conceived the idea of organizing a corporation for the purpose of carrying on a general theatrical business.   On June 20, 1912,

an agreement was entered into whereby Remick and Lawrence agreed to advance $5,000 towards financing the contemplated corporation, this sum to be returned to them out of moneys to be received from the sale of stock.    A corporation was to be organized, with a capital stock of $500,000—$300,000 common and $200,000 preferred—the par value to be $10 per share.    The preferred stock was to be sold at par, each share carrying with it a 50 per cent. bonus of the common stock.    Remick and Lawrence were to act as directors and to furnish one more director at their option.    Dey, Anger, Posey and VanNorman agreed to devote their best efforts to the sale of the stock and promoting the enterprise.    The defendant Ward was not a party to this agreement.    Promotion work was at once begun, under the name of the United Theatres Company.    A bank account was opened and funds withdrawn by checks signed by Hermann Dey as treasurer.    On July 2d, the defendant Ward was engaged by written agreement to act as general manager of the company for the period of one year at a salary varying from $50 to $100 per week.    It was also agreed that he should receive as additional compensation $5,000 of the common stock of the company, and he agreed to purchase an additional $5,000 thereof, payments therefor to be made out of the dividends paid on his stock.    On July 22d, upon payment of $1,000, Remick secured in his own name from William P. Holliday a 30-day option for a lease for a term of 50 years on certain property located on Broadway between Witherell and John R. streets in the city of Detroit, with a provision that, should such option be exercised, the lessee would erect a building on the premises to be used for theatrical and amusement purposes, to cost not less than $75,000.    On July 25, 1912, the parties to the promoters' agreement and Ward entered into articles of association of the United

Amusement Company, which were duly recorded with the secretary of State and filed with the county clerk. The purpose of the corporation was—

"to purchase, lease, erect, operate and maintain theatres and other places of amusement and to provide vaudeville, moving pictures and other theatrical attractions and other amusements."

The capital stock was stated to be $50,000, divided into 5,000 shares of the par value of $10 each. The stock subscribed was $28,000, of which each stockholder was to receive 400 shares. An organization meeting was held on July 29th, all the subscribers being present, and at which they were all elected directors. At this meeting it was resolved to increase the capital stock to $500,000, of which $300,000 was to be common and $200,000 preferred, and that the articles of association be amended to so state. A dividend of 7 per cent. was to be paid on the preferred stock, the same to be subject to redemption at par on certain fixed dates. The stockholders were to have the first opportunity to purchase the additional stock. On August 23d, at the expiration of the option secured by Remick from Holliday, heretofore referred to, upon payment of an additional $1,000 it was extended for 30 days, and on the same day this option was assigned to the amusement company "for a valuable consideration." At an adjourned stockholders' meeting, held on September 14th, a communication from John M. Ward, dated August 20th, was read, in which he stated that he was the owner of a lease of the Globe Theatre, situated on Grand River avenue, for a term of 10 years. He therein offered to transfer this lease to the corporation in consideration of the issue to him of $50,000 of the *full paid, nonassessable capital stock* of the corporation. A communication from George B. Remick was then read, in which he stated that he was the owner of the option heretofore referred to,

and in which he offered to transfer this option to the corporation in consideration of the issue to him of $245,000 of the *full paid, nonassessable capital stock* of the corporation.   By appropriate resolutions, both of these offers were accepted and the president and secretary instructed to issue and deliver the stock agreeably thereto.   A certificate of the increase of the capital stock pursuant to the action of the stockholders' meeting was executed by Mr. Lawrence as president and Mr. Anger as secretary and signed by Lawrence, Remick, Ward, Anger and Dey as directors.   It was therein stated:

"We do further certify that the total amount of common stock, including such increase, subscribed is three hundred thousand dollars.

"The total amount of preferred stock subscribed is fifteen thousand dollars.   The total amount of common stock, including such increase, actually paid in, is the sum of three hundred thousand dollars of which five thousand dollars has been paid in cash and two hundred and ninety-five thousand dollars has been paid in other property."

The lease secured from Ward and the option secured from Remick were listed as of the value of $50,000 and $245,000 respectively, and it was stated that the corporation had taken and accepted them at these valuations.   This certificate was verified by the oath of Mr. Ward, Mr. Dey and Mr. Posey, who therein stated that the property so taken was of the actual value of $295,000.   At a directors' meeting, held on July 29, 1912, the advance payments made by Remick and Lawrence were ordered returned to them.   At a meeting held on August 24th, it was resolved that the first $100,000 of preferred stock sold should carry with it a bonus of 100 per cent. of common stock and the second $100,000 a bonus of 50 per cent. of common stock.   A certificate for 25,000 shares of common

stock was issued to Mr. Remick for the Holliday option and the advance payment of $5,000. This was signed by Mr. Lawrence as president and Mr. Anger as secretary. The stub thereof was receipted by Mr. Remick. This certificate was afterwards returned and pasted on the stub, and across its face was written the word "cancelled" by Mr. Anger. A certificate for 5,000 shares was also issued to Mr. Ward, receipted for by him, and returned and canceled in the same way. This stock was afterwards treated as paid up, nonassessable stock, belonging to the stockholders in equal shares.

At a meeting of the board of directors, held on October 9th, a communication was read from Mr. Jacobson relative to the subleasing to the corporation of the Broadway Theatre, and it was decided to accept the proposition made. On November 1st, a written agreement was entered into, whereby Jacobson and Gleichman transferred to the corporation their lease on this property, acquired from the Stott Realty Company, for a term of 10 years, for a consideration of $2,500 per year in addition to the rent reserved in the lease, and Mr. Remick executed an undertaking as surety to secure such payments to the amount of $10,000. Thereupon the option for a lease of the Holliday property was abandoned and the lease on the Globe Theatre was sold for $700. The Broadway Strand Theatre was occupied for a time under the Stott company lease. There was default in the payments of rent, for which the judgments mentioned in the first paragraph of this opinion were secured. On November 2d, the board of directors authorized the payment to Remick and Lawrence of the moneys advanced by them and also of $10,000 to Remick to meet any obligations arising from his guarantee attached to the Stott lease. Some sales of stock as provided for in the resolutions had been made. Mr. Remick

died in September, 1913.    The defendant Jerome H. Remick is the executor of his estate.

The plaintiff contends that the corporation received no consideration for the shares of the common stock issued as outlined above and that the stockholders to whom they were issued and their vendees are liable to account to the plaintiff, acting for the creditors of the corporation, for the par value thereof.    The defendants insist that the value of the Holliday option and the Globe Theatre lease was determined by the board of directors in good faith, that there was no fraudulent overvaluation thereof, and that the issue of the common stock therefor was legitimate and within the power of the board of directors and not subject to the attack here made upon it.    They also claim as a matter of defense that the realty company at the time it entered into contractual relations with the amusement company was fully informed as to the transactions outlined above and that it is thereby precluded from questioning the adequacy of the consideration paid for the transfers of the option and lease or the legality of the issue of stock therefor.

The only witnesses who testified relative to this matter were William R. Brown, who was at that time acting as attorney for the amusement company, and William F. McCorkle, who was then acting for the realty company.    Mr. Brown had prepared the certificate above referred to and the minutes which had been entered on the books of the amusement company. He testified as to negotiations had in the office of Mr. McCorkle, at which Mr. Stott was also present; that McCorkle wanted "the records and the minute book of this United Amusement Company," and they were furnished him, and that he (Brown) "went over the minutes as they existed up to that time with Mr. McCorkle and discussed them;" that the record book was then fully written up and that, as he recollected,

the articles of association and certificate of increase were then presented to them; that "the fact that these two properties had been turned in for stock was discussed at that first meeting." He was asked:

"*Q.* Mr. Brown, when you took the amended articles and the certificate of increase of capital stock to Mr. McCorkle and Mr. Stott, do you know that they knew from that, from the reading of them, they knew that the corporation was taking over the Globe Theatre Company lease at $50,000 in full payment for that amount of the stock?

"*A.* Those matters were discussed at this first meeting.

"*Q.* Will you say that you took these amended articles over and that the amended articles recited that fact, and from the discussion that you speak of, would you state to the court whether they knew that that had actually been done?

"*A.* Yes.

"*Q.* And that the corporation was taking over the Holliday lease in full payment of $245,000 of stock?

"*A.* As to whether they knew it?

"*Q.* Yes.

"*A.* Yes, they did.

"*Q.* That was before this lease had been signed by the Stott Realty Company, wasn't it?

"*A.* It was.

"*Q.* And in the light of that knowledge they executed that lease, did they?

"*A.* Obviously."

Mr. McCorkle, in rebuttal, recalled the conferences testified to by Mr. Brown and stated that he "looked over their articles of association," and that he "had the record book and their by-laws," but that he did not recall having examined the certificate of increase of capital stock. The minute or record book contained the resolution adopted on July 29th authorizing the increase of the capital stock, and also set forth fully the offers of Remick and Ward and the action taken thereon, heretofore referred to.

The trial court found, and we think the record fully

justified his finding, that the realty company then knew that the common stock of the amusement company had been issued pursuant to the arrangement by which the company had secured the transfer to it of the Holliday option and the Ward lease. His conclusion that the stockholders and those who purchased from them were liable to account to the receiver for the par value of the stock, or such part thereof as was necessary to satisfy the judgments secured by the realty company, was based on the finding that what was done was a mere subterfuge to place the common stock, fully paid and nonassessable, in the hands of the then stockholders. Our decisions in the late cases of *Courtney* v. *Youngs*, 202 Mich. 384, and *Brooks* v. *Buys*, 217 Mich. 263, are relied upon to sustain this holding. In both of these cases the rule was clearly stated "That the capital stock of a corporation is the property of the corporation, a trust fund for the benefit of the corporation and its creditors," and that creditors have a right to rely on such capital stock in extending credit to the corporation. In the latter case it was said:

"Creditors of the corporation have a right to rely, in extending credit, upon the public record of corporate organization and action, including the representation therein of the amount of the capital stock and the money or property paid in for stock."

Applying this rule to the facts in this case, it is clear that plaintiff has no right of recovery. It cannot be said that the realty company relied on the fact that the capital stock in question was in the treasury of the company and a security to it for performance of the contract on the part of the amusement company. By the "public record of corporate organization" it was informed that all of the common stock had been issued and was advised of the specific property held by the corporation as a consideration

for such issue.    The examination of its record book made by its attorney and the discussion of its affairs, during the negotiations, at which Mr. Stott, its president, was also present, gave it full information as to the entire transaction.    There was no concealment.    That it did not so rely is also evidenced by the fact that it sought to secure its rental by requiring Mr. Remick to personally guarantee payment to the amount of $25,000 but contented itself with his obligation to the amount of $10,000. ·

In *Courtney* v. *Youngs, supra,* it was further said:

"Those creditors who participate in a transaction involving the transfer of corporate property at fraudulent valuation, who deal with the company with actual knowledge of what its assets are, and who extend credit knowing fully that the capital stock has been exchanged for property, and know for what property it was exchanged, cannot, when the venture proves disastrous, call upon stockholders upon the theory that they extended credit in reliance upon the capital stock and its being fully paid.    *Ten Eyck* v. *Railroad Co.,* 114 Mich. 494; *Rickerson Roller-Mills Co.* v. *Machine Co.,* 75 Fed. 554.    In the last cited case it was said by Judge Lurton:

" 'When credit is extended to a corporation with full knowledge of special arrangements between the corporation and purchasers of the stock whereby nonassessable stock has been issued for less than its par value, it cannot be said that such credit has been extended in reliance that the stock has been fully paid, or is subject to further calls by the corporation.' "

In the earlier case of *Young* v. *Erie Iron Co.,* 65 Mich. 111, it appeared as here that "there was no deception practiced anywhere, and any one dealing with the corporation had ample means of notice as to the character and value of its capital stock and property," and it was held that no liability on the part of the stockholders existed.    In the concurring opinion of Mr. Justice CHAMPLIN, in which Mr. Justice SHERWOOD joined, it was said:

"Although it is a well established doctrine, founded upon just principles, that the capital stock of a corporation, and especially its unpaid capital in the hands of subscribers or purchasers from the corporation, is a trust fund for the satisfaction of the debts of an insolvent corporation, yet it is equally well settled that persons dealing with corporations may consent to existing arrangements, and by contracting with them, with notice or knowledge of arrangements which limit the liability of the subscribers to pay the full amount of the capital stock, may expressly or impliedly waive the right to compel the stockholders to contribute the full amount of their subscriptions in discharge of corporate obligations.   *Robinson* v. *Bidwell,* 22 Cal. 379; *Coit* v. *Amalgamating Co.,* 14 Fed. 12; Mor. Corp. § 829."

The parties to the promoters' agreement were apparently men of integrity and high standing in the community in which they lived.   All of them except Mr. Anger, who was called as a witness, and Mr. VanNorman, whose whereabouts were unknown, had died before the trial of this cause, as had also Mr. Stott, president of the realty company.   That the Holliday option and the Globe Theatre Company lease were considered as valuable is apparent.   In an affidavit annexed to the certificate for increase of the capital stock, Mr. Ward, Mr. Dey and Mr. Posey stated—

"that they know the property described in the said certificate of increase and taken in payment for capital stock and that the same has been actually transferred to such corporation and they further say that said property is of the actual value of two hundred and ninety-five thousand dollars."

A careful reading of the record satisfies us that the trial court was fully justified in finding "that there was no intention of defrauding anyone," and that "Had Mr. Remick lived, it seems altogether probable that he would have continued to furnish financial

assistance until the corporation was fairly started."

It follows that a decree will be entered here dismissing the bills of complaint as to the appealing defendants, with costs.

CLARK, C. J., and MCDONALD, BIRD, MOORE, STEERE, FELLOWS, and WIEST, JJ., concurred.