## H. OLIN YOUNG v. THE ERIE IRON COMPANY ET AL.

*Mining corporation — Capital — Valuation of leasehold interest— Good-faith purchasers of stock.*

Upon a review of the testimony the decree below is reversed and the bill dismissed. An examination of the opinions being necessary to a correct understanding of the case, reference is had to the same for points decided.

Appeal from Marquette. (Grant, J.) Argued July 2, 1886. Decided February 15, 1887.

Bill filed for the appointment of a receiver for an insolvent corporation, and for other relief. Decree reversed and bill dismissed. The facts are stated in the opinion.

*Hayden & Young,* for complainant.

*Dickinson, Thurber & Hosmer* (*F. O. Clark,* of counsel), for appellants.

MORSE, J. The complainant filed the bill of complaint in this suit in behalf of himself and such other creditors of the Erie Iron Company as should come in and prove their claims against said defendant corporation, and share the expense of the proceedings, against the said Erie Iron Company, a corporation organized under Act No. 113 of the Session Laws

of 1877, and the acts amendatory thereof, and certain of the stockholders of the said company, naming them. The complainant endeavored to make all the stockholders who were responsible and residents of the State defendants. He also made defendants those stockholders who were supposed to be responsible and non-residents.

The controversy in this Court relates wholly to the liability of the defendants Martin Butzel, Magnus Butzel, and Emil S. Heineman, composing the firm of Heineman, Butzel & Co., of Detroit, Michigan, and Emil Heyn and Henry Heyn, also of Detroit, who are the only ones appealing from the decree in the court below.

The complainant, who is the assignee of D. F. Wadsworth & Co., of Ishpeming, recovered a judgment against the Erie Iron Company, in the June term, 1884, of the Marquette circuit court, for the sum of $14,204.91, upon which judgment execution was duly issued June 25, 1884, placed in the hands of the sheriff, and by him returned *nulla bona*. This judgment is still in force. The object of the bill is the appointment of a receiver of the defendant corporation, who shall take charge of its affairs and property, if any, and levy an assessment upon the stockholders to pay the claim of complainant and other debts of the corporation. No other creditors joined in the proceeding.

The bill alleges, in substance, the existence of judgment, issue and return of execution, as before stated; that the Erie Iron Company is a mining corporation organized under Act No. 113 of the Session Laws of 1877, and having its only business office at the Erie mine, in Republic, Marquette county. It names the stockholders who are made defendants, and avers that none of them have fully paid their stock subscription to said defendant corporation; that said corporation operated the Erie mine upon land leased to it by Elias H. and William A. Wright, two of the defendants, during the time the debt of complainant was incurred. It sets forth.

the organization and operations of the corporation mainly as will be stated in the summary of facts hereafter given. It also states the names of the persons, firms, and corporations to which the defendant corporation was indebted at the time of the filing of the bill, and the respective amounts owing to each. It avers the total insolvency of said corporation about September, 1883.

The bill further alleges that the capital stock of $500,000 was never fully paid in; that only $18,018 in cash was paid; and that the lease transferred by the Wrights to the corporation, at the sum of $422,000, and counted as so much cash capital paid, was worthless, and of no value whatever, and the corporation paid nothing for it; that the stock of the company, which was divided into 20,000 shares at $25 per share, was placed upon the market, and sold at from $5 to $8 a share,— none higher than $8; and charges that this enormous valuation was placed upon said lease with the fraudulent intent to secure the stockholders from assessments to pay the just debts of the corporation, and so to cheat and defraud its creditors; and that the defendants had knowledge of such intended fraud.

It avers that the stock of said corporation is liable to assessment to the full face value thereof, less the amount paid in thereon in cash. It gives the names and residences of all the stockholders, and the number of shares held by them at the time the company ceased doing business. It then shows the insolvency of the said Wrights, who, as it will be seen, were the main promoters of the company, and originally owned nearly all the stock. It alleges that the defendant corporation has no assets of any kind, except its right to levy and collect its assessments against its stockholders; that, if said right is enforced, ample means may be obtained with which to satisfy the complainant's judgment, but unless said assessments are made the complainant will lose his debt.

The prayer of the bill is:

1. That answer (not under oath) may be made.

2. That an account may be taken of the indebtedness of said defendant corporation.

3. That a receiver may be appointed.

4. That said defendant corporation may be decreed to pay complainant the amount due to him upon his judgment, principal, interest, and costs.

"5. That the indebtedness of said company to Elias H. and William A. Wright may be set off against the amount due from said Elias and William on their stock subscriptions, so far as it will go; that an account may be taken of the respective liabilities of the stockholders herein named as defendants, other than said William A. and Elias H. Wright, on their said stock subscriptions; and that they may each be decreed to pay to said receiver the amount due and remaining unpaid on the shares of stock held by him, or so much thereof as shall be found to be necessary to satisfy the debts of the company other than the indebtedness to said William A. and Elias H. Wright.

"6. And that the said receiver may apply all sums which he may receive from said stockholders in payment of such decree for stock subscriptions, and all other assets of said defendant corporation (if any) which he may collect or receive as such receiver, to the payment of your orator's judgment and costs aforesaid, and the other indebtedness of said company.

"7. That the defendant corporation may be enjoined from any way discharging, releasing, incumbering, collecting, canceling, or intermeddling with the right of recovery of said corporation against said defendant stockholders upon their respective liabilities as such stockholder as aforesaid to the said corporation, or the creditors thereof, and that it may also be prohibited from making any assignment of its property, equitable or otherwise, or any part thereof, or in anywise disposing of any of its assets; and that your orator may have such other and further relief in the premises as the nature of his case shall require, and as the court shall deem meet."

The answer of the defendants involved here denies that they were original incorporators or subscribers at any time to the stock of the defendant corporation, or that they ever purchased any stock from the corporation itself, but avers their purchase of the same from other persons in the good-faith belief that it was non-assessable and fully paid up.

They also aver that their stock was not burdened with any liability for this indebtedness.

Under a demurrer clause in their answer the point is made here that one creditor cannot file a bill to obtain a decree against stockholders in his own behalf, even if the defendants are liable. Under the view that I take of the facts, and the law as applied to such facts, it is not necessary to examine this objection.

The proofs in this case were taken in open court, and after the closing of the same and argument thereon, the Hon. C. B. Grant, judge of the Marquette circuit court, January 2, 1886, made and entered an interlocutory decree, in which, among other things, it was found, ordered, and decreed that the defendant Erie Iron Company was indebted to complainant as claimed, and that such corporation became insolvent September 7, 1883. That, at the time the suit was commenced, said company had no property or funds of any kind out of which said debt could be made or paid. That the statement in the articles of association of said corporation that $422,000 of property had been conveyed to it, at the date of its organization, the same being the Wright lease, was fraudulent *in law* as to the creditors of said corporation, and no such amount in value was by such conveyance paid into the capital stock of said corporation.

"That at no time has money or property, aside from said sublease, to an amount to exceed twenty thousand dollars, been paid into said capital stock, and that, including such conveyance of property by said sublease, not to exceed one hundred thousand dollars of the capital stock of said corporation has ever to this date been paid in.

"That the amount of such capital stock, by the articles of association of said corporation, was and is the sum of five hundred thousand dollars, divided into twenty thousand shares, of twenty-five dollars each, all of which stock was issued by the corporation.

At least $400,000 of the capital stock of the corporation remains unpaid.

"The statement contained in stock certificates issued by

the corporation, that the stock was fully paid and unassessable, was, as against creditors of the corporation, a fraud in law and void.

"That all holders of stock of said corporation, at the time it ceased business and became insolvent, on or about the seventh day of September, A. D. 1883, aforesaid, who were original incorporators of said company, or who, prior to said date, became holders of such stock with knowledge of the facts by which such stock remains unpaid as aforesaid, or who voluntarily remained after such discovery thereof, while the corporation continued to do business, are liable personally for such assessments upon their stock *pro rata* as may be called to be paid to the receiver appointed by this court in this cause, for the payment of the just debt of said corporation, up to the sum of twenty dollars per share, if the same be necessary.

"That the *pro rata* liability of such stockholders is to be measured by and confined to the total number of shares of stock in the hands of responsible persons from whom collection for their proportion of assessments can be made, who either reside within the jurisdiction of this court, or can be brought in to appear as defendants herein.

"That, in ascertaining such *pro rata* liability, shares of stock at the time of the failure of the company in the hands of insolvent or pecuniarily irresponsible persons, firms, or corporations, or those who are beyond the jurisdiction of this court, and could not be brought in to appear in this suit, shall not be considered."

That the Wrights are irresponsible, except as they claim that the defendant corporation is owing them as follows: Elias H. Wright the sum of $24,575.38, and W. A. Wright the sum of $12,689.71. They held stock in the corporation, at the time of its failure, to wit: E. H. Wright, 5,512 shares, and W. A. Wright, 3,454 shares. It is ordered that the shares of the Wrights shall not be considered in ascertaining the *pro rata* liability of the other defendant stockholders, and the debt of the company to them shall be canceled and considered paid.

The decree finds the amount of shares held by the defendants, in which finding Martin Butzel is named as the holder of 300 shares; Magnus Butzel, 300 shares; Emil S. Heine-

man, 500 shares; the copartnership of Heineman, Butzel & Co., 2,100 shares; Emil Heyn, 100 shares; and Henry Heyn, 125 shares; and that each of them was chargeable with knowledge or notice of the facts by reason of which the stock in his hands remained unpaid, and assessable for the payment of the just debts of said corporation, contracted before the failure aforesaid. Said decree also found 471 shares of said stock to be in the hands of other defendants naming them. And further finds that—

"It does not appear that there are any other like holders of stock of said corporation pecuniarily responsible within the jurisdiction of this court, but the question thereof will be referred to the commissioner under the order of reference herein made, and if it be discovered that there are other like holders of stock who are pecuniarily responsible for such decree as may be rendered against them herein, and who reside or can be found within the jurisdiction of this court, they shall be made parties defendant in this suit; but, if not, the said last-named defendants must share *pro rata*, according to the number of shares of stock held by each, in the payment of the said debts of said corporation."

And, it further appearing that there are other debts owed by the corporation at the time of its failure, provision is made by the decree for a reference to a commissioner of the court to take proofs to ascertain the amount of such indebtedness, and the names and residences of the creditors, and to report his finding of the same to the court. It is further adjudged that complainant is a creditor of the defendant corporation in the amount of his judgment, with interest upon the same at 8 per cent. from the twenty-first day of June, 1884, and costs. From this decree the defendants heretofore named appeal.

There can be but little, if any, question as to the facts in the case.

Elias H. Wright and William A. Wright, father and son, procured a lease of the mining property in question from one Coleman, and began upon their own account to work and ex-

plore the land for iron ore. They expended some $3,000 in tools and labor upon the premises, and discovered what they thought was ore of a valuable character in paying quantities. The find was in the same range as the Republic, one of the most valuable and best-paying mines in the Upper Peninsula, and the ore partook largely of the nature and character of the ore obtained from the Republic. It was supposed to be capable of making Bessemer steel. Not having the means to work and develop the mine, they decided to form a corporation, and proceeded to do so. They organized under the act approved May 11, 1877, and executed the articles of association on the first day of September, 1881. The capital stock was $500,000, and the number of shares 20,000. The amount of cash actually paid in was stated in the articles at $3,000, and the cash value of the property, real and personal, conveyed to the corporation contemporaneously with its organization, at $422,000. .

The stockholders were Elias Wright, residence, Toledo, Ohio, 12,400 shares; William A. Wright, residence, Toledo, Ohio, 4,000 shares; Peter Pascoe, residence, Republic, Michigan, 200 shares; Byron H. Andrus, residence, Republic, Michigan, 200 shares; F. H. Kearney, residence, Republic, Michigan, 200 shares. And it was stated that E. H. Wright was the holder of the remaining 3,000 shares as a trustee for the corporation, which was named the Erie Iron Company, and its business office located at Republic. The five corporators were named as directors for the first year. Elias H. Wright was elected president, and W. A. Wright secretary, of the company.

It appears that the $3,000 stated in the articles of association to be cash paid in was the amount of money considered to have been expended in working the mine or discovering it by the Wrights before the organization of the company; and the $422,000 of property, real and personal, stated therein to have been conveyed to the corporation at the time of the

formation of the same, was the estimated and agreed value of the lease held by the Wrights, which was assigned by them to the Erie Iron Company by a sublease.

The 600 shares of stock held by Pascoe, Andrus, and Kearney were given to them, or sold at a nominal price, for the purpose of interesting them in the corporation, and making the requisite number of stockholders under the statute. Pascoe was superintendent of the Republic mine and a skilled miner.

The stock held by E. H. Wright as trustee for the corporation was to be sold for working capital, and it was agreed that only 17,000 shares should be issued, which were issued to the Wrights as fully paid up in exchange for their lease, and the improvements made by them upon the property. All the stock issued, including that purchased by the defendants, was issued and sold as fully paid up and non-assessable, and so stated upon the face of the certificates. The ·stock given to Pascoe, Andrus, and Kearney came out of the stock which was issued in payment to the Wrights for their leasehold rights and improvements.

Upon the organization of this company, work was commenced in the mine, machinery was purchased, and a railroad was built, five and one-half miles in length, of very expensive grading. The railroad company extending the same from their main line, before undertaking the same, had experts of their own choosing examine the mine, and upon the faith of such examination furnished the iron for the track at their own expense. This road was built about a year after the formation of the company.

For the year 1882 the company shipped 2,731 tons of ore, and in 1883, 5,400 tons. This last was sold in Toledo, Ohio, at $7.50 per ton. Under the lease, which ran for the term of 15 years from the eleventh day of July, 1881, the company was obligated, as assignee of the Wrights, to pay Coleman a

royalty of 60 cents per ton, quarterly and in advance, for at least 10,000 tons per year.

In the year 1883, there being a depression in the iron market, which, with other causes, operated to embarrass the corporation, as is claimed by the defendants, the company became insolvent, and unable to proceed further in business. It appears from the records of the corporation that in May, 1883, the stockholders, at a special meeting called for that purpose, voted to mortgage all the company property, including the leasehold, for $60,000 to secure the payment of the bonds of the corporation for that sum. This was done for the purpose of creating a fund to pay the debts of the company. The Wrights agreed to take $20,000 of said bonds at par in payment of that amount of the corporation indebtedness to them. The bonds were issued, but it seems none were taken by any of the creditors save the Wrights. The stockholders then authorized a sale of the property, but no sale appears to have been effected. The company was owing some $8,000 royalty upon the lease, and in September, 1883, the same was declared forfeited, and the corporation suspended business for good. At this time the company was owing about $70,000, exclusive of the royalty debt, and including the debt of the Wrights and the complainant.

I find no warrant in the testimony for the claim that the Wrights intended any fraud in the organization of this company. They honestly supposed that they had found value in this mine, and seemed to believe that it might become nearly, if not equally, as valuable as the Republic mine, then worth from one to two millions of dollars. There is no doubt but at first the mine promised to be a very productive and valuable one, nor is it all certain now that it is a failure. During the first year of the working of the mine by the defendant corporation, various experts examined it, and the Wrights, as officers of the company, received offers of 50,000 and $100,-000 for a controlling interest in the stock. The superintend-

ent of the Marquette, Houghton & Ontonagon Railroad Company, who personally examined the mine, and also employed experts to do the same, offered, for himself and others interested with him, to pay $65,000, and build the railroad to the mine at their own expense, for a controlling interest in the stock.

The evidence of the Wrights, and their action in the premises, confirm the claim of defendants' counsel that they honestly believed that, with a proper development of the mine, in a short time the stock of the company would be at par, if not above par. It is true, they gave away some of their stock, and sold more or less at $5, $8, and $12.50 per share, in order, as they claim, to get people interested in the company, and to procure funds to work the mine; but this action grew out of the necessity of the corporation, not only to get money to work its mine, but to obtain as much influence as possible to reach those who had capital to invest in such enterprises, and is not at all inconsistent with the idea that the Wrights honestly thought that eventually the stock would be worth its face value. Money was needed, and had to be obtained at a sacrifice.

The Wrights, it is evident, made nothing out of the transaction, as they not only gave their time and labor to the company, but put the proceeds of their own stock sold by them into the improvement of the mine, and the grading of the railroad leading to it, and were creditors of the company in the sum of about $40,000 at the time of the failure, and had no property otherwise than their investment in the company; and they are still operating this mine under a new lease, and with a new company. I am satisfied that at the outset, and up to near the time of the suspension of business by the defendant corporation, the Wrights thought they had a most valuable mine, and were going to make a fortune out of it, and that the stock would eventually be at par and above; and we find Wright, Sr., buying back stock for $10 per share that he had sold at $5 and $8.

The circuit judge does not find any fraud in fact as charged in the bill of complaint, but he finds that the mine was not as valuable as the Wrights supposed, and that the leasehold interest held by them was not worth the $422,000, but much less, not over $80,000, and that, therefore, the statement in the articles of association was a fraud in law upon the creditors of the corporation.

It must be considered as well settled that corporators cannot agree among themselves that property worth only $80,-000 shall be treated as worth $422,000, and count, at that sum, as so much capital stock paid in, and then proceed to make their shares as fully paid up and non-assessable upon such false basis, as such action would be clearly a fraud upon the creditors. But it is equally well settled that such corporators are not responsible for an honest error of judgment, or a mistake in placing a valuation upon property appropriated or used as capital by a manufacturing or mining company. Nor can the fact that a jury or court finds property of the nature of this leasehold, necessarily fluctuating and speculative in value, worthless now, and but of little actual value at the time of its appropriation as capital, be controlling in deciding whether or not such appropriation was fraudulent as against the creditors of the corporation. Such finding will be presumptive evidence of fraud; but if it be shown that those forming the company honestly believed it to be worth the amount specified in the articles, and that their mistake was one of judgment only, their action cannot be considered fraudulent either in fact or in law. The law imposes no penalty of this kind upon a stockholder or trustee of a company for a mistake or erroneous judgment in the honest and faithful discharge of his duties.

A leasehold like the one in the case at bar might well be thought, at one time, to be of enormous value, and subsequently be ascertained to not only have no value then, but really to have never been of any worth. If, in this case, in

the honest furtherance of a good-faith purpose, the Wrights, as the promoters of this corporation, fell into an error of judgment in placing the value of $422,000 upon their lease-hold interest, it cannot be held a fraud upon the creditors or any one else. In order for the court to find a fraud in law, there must be shown either an intentional fraud in fact upon the part of the Wrights, or such reckless conduct in the placing of this value, without regard to its real worth, as would indicate, without explanation, an intent to defraud. The law applicable to cases of this character is well considered in *Boynton v. Hatch*, 47 N. Y. 228, per Allen, J.; and in *Schenck v. Andrews*, 57 Id. 133; *Boynton v. Andrews*, 63 Id. 93; *Douglass v. Ireland*, 73 Id. 100.

The Wrights testify that they acted in good faith, and believed this leasehold interest to be of great value; and their actions, and the doings of others, seem to corroborate them. Whether they believed it to be worth the full sum of $422,-000 is not clear, but it is evident that they thought it worth at least $200,000 or more, and honestly believed the stock, based upon the valuation in the articles of association, would ultimately in the near future be worth such valuation. I am far from being satisfied that any fraud was ever contemplated by them, or that they committed any in the organization of this company. There was no concealment of this valuation, or their action upon it, and no secret agreements of any kind. It was fully set forth in the articles of association, and in the issue of stock, that the capital was all paid in except $75,000 of stock to be sold, and that such payment consisted of $3,000 in cash, and the transfer of property, which, on inquiry, would have been found to be this lease, and that the stock was fully paid up and non-assessable. There was no deception practiced anywhere, and any one dealing with the corporation had ample means of notice as to the character and value of its capital stock and property. I cannot, from the proofs in the cause, find any fraud, either

in fact or in law, in the organization of this corporation. It seems that all parties connected with its formation believed in the ultimate success of the enterprise, and Pascoe and Kearney, to whom stock was given in order to induce them to become members, afterwards bought more stock, Kearney paying $11.50 per share for some of it some months after the formation of the company. It did not turn out, like many another mining venture, as they supposed and hoped it would. No one made any money by the enterprise, but the Wrights, as well as all the others, sunk what they put it, and all they could get credit for besides. If the mine had proved to be what it evidently promised in the beginning, the promoters of the scheme would have acquired great wealth, and the creditors would have been paid in full.

But, whether such overvaluation be a fraud in law as against creditors or not, I do not think the decree of the court below can stand as against the appellant defendants. It will be seen that unless new testimony shall be adduced, upon the reference, of other solvent stockholders residents of this State, or non-residents who can be brought within the jurisdiction of the circuit court for the county of Marquette in chancery, these defendants will be obliged to pay the greater portion of the debts of the corporation, as their shares stand to the shares of the other defendants in the ratio of 3,425 to 471. They will have to meet nearly six-sevenths of the indebtedness of the company. They were not original incorporators of the company, and are not shown to have had any hand whatever in the starting of the enterprise. If any fraud was ever contemplated by the Wrights, or anybody else concerned in the formation of the corporation, there is absolutely no evidence that any of the defendants interested in this appeal ever had any knowledge or notice of it.

The knowledge or notice found by the circuit judge is of a fraud in law, occasioned by the mistake of the Wrights in putting too high a price upon their lease, and incorporating the

same in their articles of association.   They were importuned to purchase this stock, as others were, by the Wrights, and bought it in good faith, relying upon its being paid and non-assessable as shown by the certificates.   They did not pur-chase, and it is not pretended they did, with any intent of defrauding the creditors of the company, or any one else, but bought the stock as a business investment, believing that it would pay.   They bought in 1882, when the mine was in a. flourishing condition as to prospects of future value, and only needed working capital, as they supposed, to realize such value.   Of the 2,100 shares held by Heineman, Butzel & Co.,. 1,106 were purchased from E. H. Wright out of his individ-ual stock, and 994 shares from the trust stock.   The stock held by the individual members of the firm was all purchased from Wright or other stockholders.   The Heyns bought theirs from stockholders.

It appears that the trust shares were never issued by the company to E. H. Wright, but, when sold by him to any per-son or persons, were issued direct by the corporation to such persons.   The 994 shares of Heineman, Butzel & Co. were so issued.   The evidence shows that value was paid for all these shares, ranging from $5 to $11.50 per share; that, before the purchase of some of it, one or more of the firm of Heineman, Butzel & Co. went to Republic, and examined the mine and its property, but did not examine the books to ascertain the financial standing of the company.   They then bought fur-ther upon the strength of such examination.   There is noth-ing showing them to have any other standing than purchasers in good faith of fully paid up and non-assessable stock. They have lost what they paid for it, and have gained nothing save it be experience in mining and in litigation.   They had no better opportunities of knowing the mode and manner of the organization of the corporation, or the worth of the lease-hold interest, than any creditor had before he became a. creditor.   There is no equity in imposing upon them nearly

the full burden of the debts of this defunct corporation in order to pay its creditors in full. Indeed, it would appear from the evidence that D. F. Wadsworth & Co., with whom the debt evidenced by complainant's judgment was contracted, held at one time stock of the company as collateral security, which stock, upon its face, revealed its non-assessable character. It is doubtful if complainant has any superior equities as against these defendant stockholders, who obtained their stock in the good-faith belief that it was not liable for indebtedness.

I can find no authority that, rightly construed and applied to the facts in this case, will hold these defendants liable to the creditors in this proceeding. The statutes of our State point out the way, in certain specified cases, in which debts against the corporation may be collected of the stockholders; but this suit is not planted upon or urged under any statute of this State.[1] If there was no fraud upon the part of the Wrights, but simply a mistake or error of judgment in the overvaluation of the lease, the authorities are nearly unanimous that the holder of the shares, purporting upon their face to be fully paid up and non-assessable, cannot be called upon to pay the debts of the corporation. The transaction can only be impeached for fraud; and some cases go so far as to hold that this attack must be made directly, and made while the stock is in the hands of the original takers of it, or of those purchasing with full knowledge of or with participation in the fraud. See New York cases heretofore cited. See, also, *Phelan v. Hazard*, 5 Dill. 45; *Smith v. North American Min. Co.*, 1 Nev. 423; *Goodrich v. Reynolds*, 31 Ill. 490; *Spense v. Iowa Valley, etc., Co.*, 36 Iowa, 407, 411; *Steacy v. Little Rock, etc., R. R. Co.*, 5 Dill. 348.

I am of the opinion that the appellant defendants must be treated as good-faith purchasers, for value, of stock from the original holders of the same. They cannot, any of them, be

---

[1] *See Miner v. Michigan Mutual Benefit Association, ante, 84.*

considered subscribers to the original capital stock of the corporation because the shares voted to E. H. Wright in trust for the corporation were issued direct to the purchasers. The 994 shares thus received by Heineman, Butzel & Co. must, under the circumstances of their purchase, stand the same as the other shares. I am of the further opinion that, being *bona fide* transferees of shares of this stock, which purported upon its face, in clear and unmistakable terms, to be fully paid up and non-assessable, their shares thus acquired are exempt from any liability to further assessment to pay the debts of the corporation. *Sanger v. Upton*, 91 U. S. 56, 60; *Steacy v. Little Rock, etc., R. R. Co.*, 5 Dill. 348, 373-377.

It follows that the decree of the court below must be reversed and vacated as against the appellant defendants, and the bill of complaint dismissed as against them, with the costs of both courts. The record will be remanded for such proceedings against the other defendants in the court below as may be desired, under the decree of that court.

CAMPBELL, C. J., concurred with MORSE, J.

CHAMPLIN, J. The bill of complaint in this case was properly filed. This is settled by the case of *Turnbull v. Prentiss Lumber Co.*, 55 Mich. 387; and the statutory provisions authorizing it were there pointed out.

Section 3 of the act under which this corporation was organized, provides that—

" It shall not be necessary for the original corporators to subscribe for the entire capital stock, but the portion not subscribed for may be disposed of, at any time afterwards, by the corporation in such manner as the by-laws of the corporation may prescribe." [1]

The act also contemplates that, aside from cash paid in on capital stock, some, if not all, of its capital may be paid in by the conveyance of property to the corporation. Section 32. These two sections seem to sanction, if not to authorize, the

---

[1] How. Stat. § 4078.

course pursued by this corporation. Although it is a well established doctrine, founded upon just principles, that the capital stock of a corporation, and especially its unpaid capital in the hands of subscribers or purchasers from the corporation, is a trust fund for the satisfaction of the debts of an insolvent corporation, yet it is equally well settled that persons dealing with corporations may consent to existing arrangements, and by contracting with them, with notice or knowledge of arrangements which limit the liability of the subscribers to pay the full amount of the capital stock, may expressly or impliedly waive the right to compel the stockholders to contribute the full amount of their subscriptions in discharge of corporate obligations. *Robinson v. Bidwell,*. 22 Cal. 379; *Coit v. North Carolina, etc., Co.,* 14 Fed. Rep. 12; Mor. Corp. § 829.

There is no allegation in the bill that the creditors represented by complainant did not know and fully understand that the capital stock was paid up by property transferred to the corporation, or that the stock issued or sold by it was issued as full-paid stock, and not liable to further assessment. On the contrary, the complainant's assignors held shares of the stock, representing upon the face of it to be full paid, as collateral security for money loaned to the corporation. An exception to the principle that the capital of a corporation is a trust fund to which creditors can resort for payment is recognized in some states in favor of mining corporations, based upon the universal knowledge of the custom of such corporations to have a very large nominal capital, and to issue such capital to its full amount as paid up, but to dispose of it for what it will bring in the market. The capital of such corporations, from the nature of the venture, is of an extremely fluctuating and uncertain character, and is invested in property acquired for the sole purpose of being exhausted and distributed among shareholders in the form of dividends, and not kept as a permanent fund with which to

carry on business. *In re South Mountain, etc., Min. Co.,* 7 Sawy. 30 (5 Fed. Rep. 403); S. C. 8 Id. 366 (14 Fed. Rep. 347).

Persons, therefore, contracting with mining corporations, knowing that its capital was not fully paid up, but so declared for. the purpose of discharging its stockholders from the unpaid portion thereof, should be considered and held as having done so subject to these conditions. I am satisfied from the testimony in this case that the complainant's assignors were well aware of the manner in which the stock of this corporation had been issued and disposed of. Under the statute authorizing the formation of mining corporations it may be questionable whether there is any personal liability to pay for stock issued by the company, or whether, in case of non-payment, an assessment can be enforced only by forfeiture and sale of the stock. As it does not arise in this case, I reserve my opinion upon it. I concur in dismissing the bill as to defendants appealing.

. SHERWOOD, J., concurred with CHAMPLIN, J.