McBryan *v.* UNIVERSAL ELEVATOR CO. [1]

1. Equity Practice—Creditor's Bill by Receiver.

    A bill praying an assessment against stockholders, filed by a receiver of the corporation on behalf of a judgment creditor, is not prematurely brought, though all the corporate debts have not been ascertained, and no leave has been obtained from the court to institute suit against the stockholders.

2. Sale—Retention of Title—Retaking Property—Suit for Purchase Price.

    A contract for the sale of machinery to a corporation provided that title should remain in the vendor until notes given for the purchase price were fully paid; that the vendor might retake the property at any time for default in payment, in which case payments made should be considered as paid for use; and that the rental value should be a certain amount per month. No payments were made on the notes, and the vendor, after retaking the machinery and selling it, recovered a judgment against the corporation for the difference between the amount of the notes and the proceeds of the sale. *Held*, (1) that, after retaking the machinery, the consideration for the notes failed; (2) that the judgment for part of the purchase price was erroneous, and could not be sustained, even on the ground that a larger one for rental might have been obtained.

3. Same—Judgment—Collateral Attack.

    Such judgment is not conclusive against a stockholder of the corporation in a suit by its receiver to collect unpaid subscriptions to the capital stock for the purpose of paying the judgment.

4. Corporations—Capital Stock—When Paid Up.

    When incorporators pass no judgment upon the value of assets turned in as capital stock instead of money, such capital stock will be considered as paid only to the amount of the value of the assets as ascertained by the court. Per Grant, J.

5. Same—Liability of Incorporators—Transfer of Stock.

    Original incorporators who recklessly make false statements as

---

[1] Rehearing denied June 11, 1902.

to the amount of capital stock actually paid in cannot escape liability to persons who become creditors after they have transferred their stock. Per GRANT, J.

Appeal from Wayne; Waite, J.   Submitted October 24, 1901.   (Docket No. 76.)   Decided March 26, 1902.

Bill by William H. McBryan, receiver of the Universal Elevator Company, against the Universal Elevator Company, Charles W. Moore, Marvin M. Stanton, Wilbur Brotherton, Frank E. Schoonmaker, trustee, Frank E. Schoonmaker, James N. Schoonmaker, William R. Johnston, William H. Hultgren, William B. Bierce, John H. Duffie, Charles T. Duffie, and Alvah H. Leavitt, to enforce an alleged liability for unpaid subscriptions to the capital stock of defendant corporation.   From a decree dismissing the bill, complainant appeals.   Affirmed.

A corporation, known as the "C. C. Wormer Machinery Company of Detroit," sold and delivered to the Universal Elevator Company, in April, 1896, machinery, at an agreed price of $9,697.68.   No cash was paid down, and two notes were given covering the entire purchase price. The contract of sale expressly provided that the title to the property should remain in the Wormer Company until the full sum had been paid; that the rental value thereof was $750 per month; that said company might at any time enter upon the premises of the defendant company and take possession of the property, and that any money already paid should be considered as having been paid for the use of said property.   The machinery was placed in the building erected by the defendant company, and remained there until March, 1897, when the Wormer Company took possession of it and sold the most of it.   Whether it had been used does not appear.   The Elevator Company was a failure, and in August, 1896, Mr. Livingstone took possession of the building and its contents, under a deed made to him by the Elevator Company.   The Wormer Company sued the Elevator Company, declaring on the com-

mon counts, and for the use and occupation of machinery, etc. A plea of the general issue was interposed. Whether any further steps were taken to defend the suit the record does not show. The judgment, as appears by the testimony of the agent of the Wormer Company, Mr. O'Hara, taken at the trial, was for the difference between the value of the machinery when taken back and the amount of the notes, with interest and insurance premiums added, paid by the Wormer Company. Judgment was rendered for $4,997.69. Execution was issued and returned *nulla bona*. The Wormer Company then filed a judgment creditor's bill, and obtained a receiver, Mr. McBryan, the complainant in this case. Complainant thereupon filed this bill against the Elevator Company and the other defendants, who are stockholders, alleging that the stock was not fully paid, and praying an assessment against the stockholders to pay this and other debts of the company.

The original stockholders were: Moore, 2,500 shares; Brotherton, 675 shares; Stanton, 1,000 shares; James N. Schoonmaker, 750 shares; Frank E. Schoonmaker, trustee, 700 shares; Frank E. Schoonmaker, 700 shares. The other defendants subsequently became stockholders. The defenses made as to all of the defendant stockholders are:

1. That this action was prematurely brought, because all the corporate debts have not been ascertained, and no leave obtained from the court to institute this suit against the stockholders.

2. That the assets conveyed to the corporation at the time of its organization were worth the sum of $63,250, the amount of the capital stock shown by the articles of association to have been actually paid in.

3. That the judgment is void, under *Perkins* v. *Grobben*, 116 Mich. 178 (74 N. W. 469, 39 L. R. A. 815, 72 Am. St. Rep. 512), because the Wormer Company took its property in accordance with the contract of sale, and cannot now sue for the purchase price, and that the judgment against the company is not conclusive in a suit against the stockholders.

Proofs were taken in open court, and the bill dismissed.

The history of the organization of the defendant company, and the relation of all defendants thereto, except Bierce, John and Charles Duffie, and Leavitt, are given in *Moore* v. *Universal Elevator Co.*, 122 Mich. 48 (80 N. W. 1015), and it is unnecessary to repeat them here.

*Moore & Moore*, for complainant.

*S. S. Babcock* ( *W. F. Atkinson*, of counsel ), for defendant Moore.

*Dickinson, Warren & Warren*, for defendant Stanton.

*Isaac N. Payne*, for defendant Brotherton.

*Leo M. Butzel*, for defendant Bierce.

GRANT, J. ( *after stating the facts* ). 1. This suit was properly launched. No application to the court for leave to bring suit is required. Chancery Rule No. 31; 3 Comp. Laws, §§ 10841, 10842. A judgment creditor is entitled to maintain a bill to seek assets to satisfy his judgment and execution. *Turnbull* v. *Lumber Co.*, 55 Mich. 387, 392 (21 N. W. 375); *Young* v. *Iron Co.*, 65 Mich. 111, 127 (31 N. W. 814). Other creditors can come in under such a proceeding if they so desire, and the court may make an order for serving notice upon them. A judgment creditor is under no legal or moral obligation to bring in other creditors. He may proceed to secure his own rights independent of them. The bill in this case is substantially the same as that in *Young* v. *Iron Co.;* the only difference being that in that case the receiver in his petition stated that he instituted the suit for himself and other creditors who should choose to come in, while this bill contains no such allegations. The bill, however, is broad enough to include other creditors who may choose to come in, for one of the prayers is that the debts of the defendant company may be ascertained and decreed.

2. Was the C. C. Wormer Machinery Company entitled to the judgment it took? The title to the machinery did

not pass, but was expressly reserved in the vendor. The vendor retook it under its contract, and, as stated by counsel for complainant, who was the attorney for the Wormer Company, "sold the property for its then value, 'the then selling price, which was all that we could get for it,' applied the amount on the notes, and brought suit against the Elevator Company for the balance." The record is conclusive that the judgment was taken for the difference between the contract price and the estimated value when retaken.

In *Perkins* v. *Grobben*, 116 Mich. 172 (74 N. W. 469, 39 L. R. A. 815, 72 Am. St. Rep. 512), the contract provided that the title should not pass until full payment, and that all payments made on the notes which were given for the purchase price should be deemed "to be payments for the use, wear, and tear of the property up to the retaking thereof." There is no substantial difference between the above provision of that contract and the one in this providing that the monthly rental value of the property was $750, if such provision be conclusive as an implied contract to pay that amount as rental if the vendor should retake the property. In that case money had been paid, while in this case none had been paid. But that difference cannot change the rule of law. The notes were given in consideration of the property contracted to be sold. When the property was retaken under the contract, there was no longer any consideration for the notes. The only remedy open to the vendor in such case is to sue for the rental value, or bring a suit for damages for nonperformance of the contract. He cannot bring suit to recover the purchase price, or any part thereof. A defense upon this ground would, therefore, have been fatal to the plaintiff's right of action, based upon the theory upon which the judgment was rendered. The judgment is, of course, valid as against the defendant Elevator Company, and is not open to a collateral attack by it. The judgment could only be set aside by that company upon a direct proceeding for that purpose.

It is also urged that the judgment should be sustained because judgment for a larger amount might have been rendered for the rental of the property, and therefore the stockholders are not prejudiced. Counsel for the defendants challenge the right to recover the rental during the time claimed by the complainant. Upon this question, as well as upon the construction of the contract, the defendant company was entitled to be heard in the suit at law. A judgment rendered upon an illegal basis cannot be sustained because one might have been rendered upon a legal basis.

It is claimed that the Wormer Company retook this property by agreement. Whether Mr. Moore, the president of the company, had any authority to make such an arrangement, we need not consider. All Mr. Moore said to the agent of the Wormer Company was to advise him that he had better take back his property, and dispose of it. This did not make a new contract. It was advice simply to the company to take advantage of the contract it had made.

Is the judgment conclusive against a stockholder? While it is the general rule that judgments against corporations are conclusive upon the stockholders, an exception is equally well established in cases where judgments are rendered through fraud or collusion, or without jurisdiction. 3 Thomp. Corp. §§ 3392, 3400; 2 Mor. Priv. Corp. § 865; 1 Cook, Corp. § 209; *Bohn* v. *Brown*, 33 Mich. 257, 263. In *Bohn* v. *Brown* this court said:

"If the proceedings against the corporation should appear to be tainted by fraud or collusion between the claimant and the corporation, the judgment would not be good as inducement, or as an adjudication to fix the liability of the stockholder through it, or to fix the amount, and the suit against the stockholder would fail inevitably."

This exception is approved in the following cases: *Irons* v. *Bank*, 36 Fed. 843; *Schrader* v. *Bank*, 133 U. S. 67 (10 Sup. Ct. 238); *Slee* v. *Bloom*, 20 Johns. 669; *Warrington* v. *Ball*, 33 C. C. A. 609, 90 Fed. 464; *Saylor* v. *Banking Co.*, 38 Or. 204 (62 Pac. 652); *Ward* v. *Joslin*, 44 C. C. A. 456, 105 Fed. 224.

In *Schrader* v. *Bank* judgment was rendered against the bank on a contract of guaranty. In a suit against the stockholders to enforce their liability as such, it was held that they could go behind the record of the judgment, and show that the guaranty of the bank had been released by the release of the principal debtor before judgment was taken against the bank. In *Slee* v. *Bloom* it was said that a judgment "is not of itself, as *res judicata*, binding on the stockholders, if it was procured by fraud, or is founded in error." In *Warrington* v. *Ball* the defense set up was that the judgment was obtained by collusion between the plaintiff and the representatives of the bank, and that the certificate of deposit on which the judgment was based was issued for money furnished to the cashier personally. The judgment was held not to be conclusive upon the stockholders. The opinion says:

"To bind one by a judgment to which he is not a party, as provided for by the statute, is barely tolerable. To bind him by such a judgment obtained by fraudulent collusion would be intolerable."

In *Saylor* v. *Banking Co.* the judgment against the corporation was based upon a promissory note executed by the president and secretary of the corporation to the president, and plaintiff sought to enforce payment of the judgment by assessments against the stockholders for unpaid subscriptions. It was held that they could attack the validity of the judgment upon the ground that the execution of the note had not been authorized by the directors. See, also, *Mandeville* v. *Reynolds*, 68 N. Y. 528, and *Conway* v. *Duncan*, 28 Ohio St. 102, in which judgments were held not conclusive.

We think the principle approved in these decisions is sound, and that when a stockholder can show, even *aliunde* the record, that the judgment is wholly void, he may do so as a defense to his liability as a stockholder.

3. We might rest here without determining the important questions raised as to the value of the assets which comprised the value of the capital stock issued as fully

paid, and as to the liability of the original and subsequent stockholders, but the record and briefs are mainly devoted to these questions. There are other creditors of the defendant corporation who are entitled to come in, prove their claims, and enforce the liability of the stockholders, if there is any. The parties have been subjected to large and expensive litigation, which ought to be brought to an end. We should, therefore, dispose of these questions.

The duty of the corporators in putting in property as paid-up capital stock is fully stated in *Moore* v. *Universal Elevator Co.*, and needs no further discussion by us. The original incorporators exercised no judgment whatever upon the value of the assets transferred to the corporation by Schoonmaker Bros. & Co. as worth $63,250, and for which stock was issued to that amount as fully paid. No one asked, and no one volunteered an opinion, as to their value. Moore, Stanton, and Brotherton, the only original incorporators of any financial responsibility, testified that they did not ask or consider the value of the assets. They considered themselves as mere dummies to sign the articles of incorporation, make the solemn assertion and certification that stock of the value of $63,250 had been actually paid in, and that they each had subscribed for a certain number of shares. They believed that they could immediately transfer their stock to the Schoonmaker Bros. without incurring any liability whatever. They testified that an attorney, who was present, so advised them. This attorney was not produced as a witness. Frank E. Schoonmaker was not a witness. James N. Schoonmaker testified that he did not know the value of these patent devices. This case, therefore, affords no room for the application of the rule of *Young* v. *Iron Co.*, 65 Mich. 111 (31 N. W. 814), that "corporators are not responsible for an honest error of judgment, or a mistake, in placing a valuation upon property appropriated or used as capital," and as approved in *Graves* v. *Brooks*, 117 Mich. 424 (75 N. W. 932). In cases where the incorporators passed no judgment upon the value of the assets

turned in as capital stock instead of money, the only course left open to courts, when called upon to determine whether the stock has been fully paid, is to ascertain the actual value of the property which was turned in as capital stock, and hold that the stock is only paid to the extent of the value of the property so found. This brings us to the question of the value of these assets.

We found in *Moore* v. *Universal Elevator Co.* that the property conveyed was not worth the amount stated in the articles of association, and that as to the Schoonmakers and Hultgren it was a fraud in fact, and that as to the other parties it was a fraud in law, if not in fact. The assets put in to form a corporation with $63,250 of capital stock fully paid in are as follows: Elevator patents, $27,000; business of the Otto Gas-Engine Company, $10,000; factory and property, $15,500; business incidental with mechanical engineering, $10,750.

Schoonmaker Bros. & Co. were agents for the Otto Gas-Engine Company. That agency was revocable at any time. Schoonmaker Bros. & Co. could not transfer it to the Elevator Company without the assent of the Gas-Engine Company. There is no evidence of any such arrangement with that company, or any agreement that the Gas-Engine Company would accept the Elevator Company as its agent. It may be inferred from the record that the Gas-Engine Company raised no objection to the Elevator Company's acting as its agent during the time the latter carried on business. It appears from the depositions of the officers of the Otto Gas-Engine Company that the commissions paid Schoonmaker Bros. & Co. were as follows: 1893-4, $337.90; 1895, $1,043.34; 1896, $1,399.91; 1897, $1,160.73. Out of this, however, were to come Schoonmaker Bros. & Co.'s expenses, and it is not shown how much these were. At the same time Schoonmaker Bros. & Co. were selling elevators for Morse, Williams & Co., of Philadelphia, and had the exclusive agency for the Variety Machine Company, a manufacturer of hand elevators. Is a revocable commission agency, yielding from

$300 to $1,400 a year, worth $10,000 as part of the capital stock of a corporation organized for another and entirely different purpose? If this contention were sustained, it would result that three or more agents, having no tangible property, might form a manufacturing corporation of $20,000 to $100,000, fully paid up, by simply putting in their revocable agencies as salesmen. This is not the tangible property which the statute requires to constitute a part of the paid-up capital stock of a corporation. It was an intangible asset, of no value whatever to the creditors of the Elevator Company.

"Business incidental with mechanical engineering, $10,-750." No tangible property whatever, except perhaps $150 worth of tools used by Schoonmaker Bros. & Co., was included in this asset, and I find no evidence that these tools became the property of the corporation. Schoonmaker Bros. & Co. employed from three to five men in connection with their business as agents for the three companies, viz., the Gas-Engine Company, the Variety Machine Company, and Morse, Williams & Co., for whom they sold elevators. Naturally, Morse, Williams & Co. would not employ the Elevator Company to act as their agent when it was engaged in a rival business. James N. Schoonmaker testified that this item "was for our business as experts; our ability to carry on the business; our skill. It didn't represent any tangible property. There was no contract made by which we were to work for the company." Mr. Schoonmaker was unable to tell whether there was any profit in the agency, and, when asked upon what he based or computed the agency to be worth $10,000, replied, "As to the possibility there was in the business we were doing." What is the cash value of a possibility, and that a possibility which Schoonmaker Bros. & Co. had not contracted to continue for the benefit of the corporation?

Within four months after the making and filing of these articles of association, the directors of the Elevator Company made and filed a statement of their assets and liabil-

ities, in which these two items disappeared as a part of the capital stock. In that statement the only assets are: Cash paid in, $17,000, and five United States patents, $46,250. Not only was this done, but the stock issued for the item of "Business incidental with mechanical engineering" was surrendered and canceled. To hold that this action on the part of the incorporators was in compliance with the statute, which, under the decision in *Young* v. *Iron Co.*, at least requires that the incorporators pass an honest judgment on the value of the assets put in as capital stock, would defeat the purpose of the statute, and render it utterly valueless. If the statute required the articles of association to state the property put in as capital stock, it might be held that creditors should deal with the corporation at their own risk. But until the legislature sees fit to enact such a provision, incorporators must be required to act in good faith in placing values upon property put in as a part of paid-up capital stock, and the right of those dealing with the corporation to rely upon these solemn statements must be preserved.

There was no factory in existence at the time the company was organized, but it had bonus subscriptions, amounting to something like $8,000, and a bonus subscription of an acre and a half of ground on which to place the factory. There was no other property at that time, except those bonuses.

The one-third interest in the patents, which was turned in at $27,000, consisted of a one-third interest in five devices used in making elevators. There were other devices used by other companies designed to accomplish the same purposes. Mr. Hultgren, the patentee, and Mr. Ellithorpe, who was interested with him, estimated these devices as worth much more than the interest conveyed by Mr. Hultgren to the Elevator Company through the Schoonmakers. An attorney, an expert in patents and their value, testified that these devices were of little value. As against these opinions, what are the facts? Mr. Hultgren sold one shop right to a company in Springfield for $200. This gave

that company the right to manufacture only in Springfield, but the right to sell anywhere in the world. He also received, for a similar right, about $200 or $300 from an elevator company in Chicago, in 1891–92. He has received no royalty since, because that company ceased to use the device. He was employed by the Michigan Elevator Company at a salary of $2,000, requiring him to devote his whole-time to the business. This salary included the right to use his devices. He worked for an elevator company in Toledo at $1,800 a year, which included his services and the use of one of his devices. Mr. Hultgren refused to sign the articles of association, "because I couldn't see where any money would be forthcoming by which it would place us in a position to manufacture;" and that, although the assets, in his judgment, were worth $63,000, yet they would not give the company any credit. If these patent devices are of the value placed upon them by Hultgren and Ellithorpe, the receiver ought to be able to sell a one-third interest in them for something; but none of the parties to this litigation have seemed to regard them as of sufficient value to justify an attempted sale, and no one has offered to buy such valuable property. These facts are much more convincing than the opinion of interested parties. I reach the same conclusion that was reached in *Moore* v. *Universal Elevator Co.*, that these devices were practically worthless.

4. It is urged on behalf of Moore, Stanton, and Brotherton that they had transferred their stock before the debt of the Wormer Company was contracted, and that therefore they are not liable. No question of the *bona fide* transfer of stock is involved. The question is, Can original incorporators make a false statement as to the amount of capital stock actually paid in, and escape liability for such false representations, immediately after executing the articles of association, by transferring their stock to other parties? The wrong was done by the original incorporators in making a false statement as to the amount of stock actually paid in. The public, and creditors dealing

with the corporation, had the right to rely upon this statement as true. Subsequent purchasers of stock were also entitled to rely upon it as true. It would be unjust to visit the sins of the original incorporators upon subsequent stockholders who purchased in good faith. It would be a disgrace to the law if creditors, dealing with the corporation in reliance upon these statements, which they examine in the public offices, where they are on file, had no remedy. Justice and good morals require that they who make such false statements, whether they make them intentionally or, as in this case, recklessly, should respond in damages therefor. The law does not permit them to evade this liability by a transfer of their stock.

I think the decree should be modified in accordance with this opinion, and the case remanded, with directions to the receiver to sell the interest in the patent devices, if a purchaser can be found, and to apply the proceeds thereof in payment of the judgment in favor of the Wormer Company, and to proceed under the order and direction of the court below to assess the original incorporators to pay other debts, should any be proven; but my brethren think the decree should be sustained, with costs, and it is so ordered.

MOORE, J. I do not think the disposition of the case requires the discussion under head 3 of the opinion, and express no opinion in relation to the question there discussed. I concur in the disposition of the case made by Justice GRANT.

HOOKER, C. J., and MONTGOMERY, J., concurred with MOORE, J. LONG, J., did not sit.