## OEHRING v. FOX TYPEWRITER CO. et al.

(Circuit Court of Appeals, Sixth Circuit. May 5, 1921.)

No. 3454.

1. **Corporations ⊜⇒579(2)—Where, on reorganization, old stockholders receive nothing for their stock and pay cash for the new stock, they are not liable for debts of old company as enjoying benefit from old stock.**

Where, on formation of new company to take over the business of the old, the stockholders in the old company receive nothing in exchange for their old stock and pay cash for stock in the new company, they are not liable for debts of the old company, on the theory that they have received a benefit from their stock in the old company, to which they are not rightfully entitled until after payment of debts due by the old company.

2. **Corporations ⊜⇒579(2)—Contingent creditor of corporation transferring assets not barred from relief for fraud in transfer.**

The contingent character of the claim of a creditor of a corporation at the time of the transfer of its assets does not, of itself, bar him from later proceeding as a defrauded creditor.

3. **Appeal and error ⊜⇒1012(1)—Finding of trial judge conclusive.**

The trial court's finding prevails, in the absence of evidence clearly preponderating to the contrary.

4. **Corporations ⊜⇒580—Where assets of abandoned corporation transferred to new corporation, creditor for whom no provision made entitled to be placed in statu quo.**

A Michigan corporation became embarrassed, and certain employés organized a new corporation, which took over the assets of the old corporation for a consideration of $46,000, the amount of the book debts, which sum was used to pay such debts. Stockholders of the old company received nothing for their stock, except an opportunity to buy stock in the new corporation, for which, however, they, as well as others induced to subscribe, were required to pay cash. Previous to the reorganization, a judgment for accounting for infringing a multiple drill patent had been recovered against the old company, but the reorganizers were advised and understood that there was no reason to anticipate that the accounting would disclose substantial profits, so as to allow recovery of substantial damages, and consequently no provision was made for this contingent liability; it being regarded as negligible. However, on the accounting two years later, substantial profits were shown, and a judgment for $11,382 was entered, and, execution having been returned unsatisfied, the plaintiff in that suit filed a creditor's bill against the new company. *Held*, on appeal from judgment of dismissal, in view of the finding that there was no fraud in the transfer of the assets, that plaintiff was entitled to be restored to the position he would have had, if he had received notice and had opportunity to protect his interests, which would necessitate a decree or order by which he should have the chance to participate in fixing the realizable value of the assets—as at a public sale—and by which the surplus, if any, over the $46,000 necessary to pay the debts which could be given priority over him, should be preserved for the satisfaction of his judgment, and the cause would be remanded for a decree directed to that end.

---

Appeal from the District Court of the United States for the Southern Division of the Western District of Michigan; Clarence W. Sessions, Judge.

Action by August J. Oehring against the Fox Typewriter Company and others. From a judgment for defendants, plaintiff appeals. Reversed and remanded.

The Fox Typewriter Company was a Michigan corporation, which had been originally engaged in the manufacture of woodworking machinery and tools, and later added the making of typewriters. It was not successful, was largely indebted to the local banks, its management was not satisfactory to the creditors, and representatives of the banks became directors, and took over the power of control. As representing this controlling interest, Mr. Duffy was made president, and thereafter was in active charge of matters of general policy, though not of operations. The business continuing to be unsatisfactory, the company accepted an offer from Mr. Fox, whereby it sold to him the machinery and tool business and all assets peculiar thereto, leaving with the company the plant and the typewritter business. After some further delay, there did not seem to be a sufficient promise in this business to satisfy the creditors, it was determined to liquidate, and some machinery was sold. Thereupon Stokoe and Franks, who were employés of the company, respectively, in the manufacture and sales division, and who had no substantial stock interest (though Stokoe was secretary and a director), undertook to promote a new company to buy the assets and make further efforts to conduct a successful typewriter business. The debts of the company, as carried on its books, were about $44,000. There was also a recognized contingent liability upon a bond, which turned out to be about $2,000. The debts will therefore, for convenience, be spoken of as $46,000 (and by that sum, as hereafter used, we intend to describe the amount of the book debts plus the contingent liability as it was later paid).

Stokoe and Franks procured from the management an option to sell to them the entire plant and the typewriter business and assets for this $46,000, and succeeded in finding, among the old stockholders and their families, subscribers to make up this amount. Opportunity to subscribe was given to all old stockholders, but only a minor fraction accepted, and these subscribed in such amounts as each one wished, and without regard to the amount of his holdings of the old stock. Pursuant to that option, the company later conveyed all these assets to a trustee, who, in turn, conveyed them to a new corporation formed by these subscribers, receiving therefrom a fund of $44,000, which was disbursed in full payment of the book debts. Subscribers paid cash, and received no benefit from their old stock holdings, except the opportunity to subscribe to the new company, and there was no connection between their old and their new stock holdings, save as the old investment and loss furnished motive for the new investment in the hope of retrieving the loss. These transactions occupied a part of the summer of 1915, and the new company was completed and started business in October, 1915.

In 1914, the District Court, in the Southern District of New York, had granted a decree in favor of Oehring against the Typewriter Company, finding that it had infringed Oehring's patent upon a multiple drill. This infringement pertained to the machinery branch, and did not involve the typewriter business, save as both belonged to the same company. The decree was the usual one for injunction and accounting, and the defendant, not having thought best to appeal at that stage, had submitted to the injunction, and an accounting had proceeded rather desultorily. The company was advised, and Stokoe and Franks understood, that there was no reason to anticipate any substantial recovery of damages. In the sale to the new company and the provision for paying the debts, this contingent liability to Oehring was ignored. Stokoe and Franks and the attorney for the company, active with them in the new corporation, do not undertake to say that it was actually forgotten, but only that they thought it was of no substance or consequence; they say the suit was to recover profits, and there had been none, and that they did in

good faith consider it negligible seems to be demonstrated from the fact that although plainly, if it was a liability, it was against the branch of the business sold to Fox, yet it was not assumed by him, and no one seems to have thought of it in that connection.

In September, 1916, the master, before whom the accounting had been pending, made a report showing substantial profits; this was confirmed by the District Court, and later affirmed by the Second Circuit Court of Appeals, whereby there resulted a final judgment in that District Court, in favor of Oehring and against the old typewriter company, under date of May 8, 1918, for $11,382.95, with interest from February 24, 1917. An execution having been returned unsatisfied, Oehring filed this bill in the court below against the new typewriter company. It was in the usual form of a creditor's bill, and its theory was that the transfer of assets from the old company to the new was invalid as against Oehring for actual fraud or constructive fraud, or both, and that the assets so transferred remained the equitable property of the old company, subject, in equity, to Oehring's execution. The bill also presented the theory that the new company had become liable for this debt of the old company. The court below held that there was no fraud or invalidity in the transfer from the old company to the new, and dismissed the bill.

Murray Seasongood, of Cincinnati, Ohio (Hans v. Briesen, of New York City, and Robert P. Goldman, of Cincinnati, Ohio, on the brief), for appellant.

Charles M. Owen, of Grand Rapids, Mich. (Clapperton & Owen, of Grand Rapids, Mich., on the brief), for appellees.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

DENISON, Circuit Judge (after stating the facts as above). [1] 1. The plaintiff has no right to relief as upon a reorganization, under the doctrine of Northern Pacific v. Boyd, 228 U. S. 482, 33 Sup. Ct. 554, 57 L. Ed. 931, and Grenell v. Detroit Co., 112 Mich. 70, 70 N. W. 413. In that line of cases there is a reorganization in which the old stockholders obtain an interest in the new company by virtue of and in consideration of their old stock, and therefore receive from that stock a benefit to which they are not rightfully entitled until after the payment of all debts due by the old company, and it is only this benefit, so received in consideration for the old stock, which the rule of the Boyd Case subjects to the old debts. In the present case there was no such benefit. Every new stockholder paid cash in full for his new stock and received nothing in exchange for his old.

[2] 2. While it is to be conceded that the peculiar and contingent character of Oehring's claim at the time of the transfer of assets does not, of itself, bar him from later proceeding as a defrauded judgment creditor (Pierce v. U. S. [March 7, 1921] 255 U. S. ——, 41 Sup. Ct. 365, 65 L. Ed. ——), yet we see no reason to hesitate in accepting the conclusion of the trial judge that there was no conscious or intentional plan that Oehring should be "frozen out"—that is, no conscious fraud. We think the natural and true inference from what the parties did is that his claim was thought of by the three or four associates who had any knowledge of it only as a cloud, too small and too far away to require serious attention, and particularly is this true in view of the apparently natural inference that, if it ever did develop, the other branch of the business was the one really liable.

[3] 3. The $46,000 consideration paid for the assets is said to have been so far below the actual value as to make the transfer constructively fraudulent against one in Oehring's position, whose claim subsequently ripened into an enforceable debt. We have no occasion to doubt that, upon proper facts, this conclusion could be drawn even at so late a date and in favor of one handicapped as Oehring was, and the facts of this case lend color to the charge; but the District Judge, familiar with the local situation and on hearing of witnesses in open court, concluded that there was no such gross undervaluation as to require the inference charged, and his conclusion must prevail, unless the evidence clearly preponderates to the contrary. City, etc., v. Chisholm (C. C. A. 6) 90 Fed. 431, 434, 33 C. C. A. 157. We cannot say that there is any such preponderance of proof in Oehring's favor on this issue as to require reversal. It appears that the assets transferred had been carried on the books of the old company at a large figure, but that is not of controlling importance, where the assets are of a special character and the business is failing. It appears, also, that these assets were immediately insured by the new company for a large sum; but with such assets it is not unusual to maintain insurance with reference to original cost rather than upon the basis of liquidating value. The chief item of evidence supporting the theory of gross undervaluation was that, while the promoters of the new company paid $46,000, they immediately put the same assets into the new company as consideration for full payment of the $100,000 of new stock, making the usual formal affidavits that the stock was paid in full by these assets.

In a state where it is required that capital stock shall be paid either in cash or in property at actual cash value, it might well be held that the promoters of the new corporation could not deny that the property was worth $100,000 upon a cash basis, and that there was therefore ample surplus out of which Oehring might have been provided for in full; but that restricted theory of payment does not prevail in Michigan. Full-paid stock may be issued in exchange for property at any figure which the directors in good faith fix, and the subsequent judgment of the court or jury as to the real value of the property cannot be substituted for the good faith exercise of the directors' discretion. Young v. Erie Iron Co., 65 Mich. 111, 122, 31 N. W. 814; Coit v. Gold Co., 119 U. S. 343, 345, 7 Sup. Ct. 231, 30 L. Ed. 420.

The defendants' testimony tends to show that the reputation of the typewriter business, as having been consistently unsuccessful, was so bad that the promoters had the utmost difficulty in raising the $46,000, and would have been unable to make the purchase if the price had been substantially larger. As to every asset, except the factory buildings, it is evident that there is a considerable gulf between their cash value upon liquidation after years of unsuccessful business, under a discredited management, and without capital or credit, and their reasonable prospective value to continue the business, under new management, with debts paid, and with sufficient working capital or credit. Even the factory buildings would be subject to similar considerations, particularly if located, as these were said to be, at a point which was not

satisfactory for many business purposes. That the majority of the old stockholders, many of ample means, preferred to lose all their stock investment rather than risk any more by joining in the new purchase is forceful evidence that any substantial value above $46,000 was doubtful. Balancing these items of evidence, there can be no assurance that any sum substantially in excess of $46,000 could have been realized, nor yet is the contrary established. However, it is, to say the least, probable enough that there might have been a surplus available for Oehring's benefit to call for careful scrutiny of the procedure by which it disappeared.

[4] 4. The decision of this court in Rickerson Co. v. Farrell Co., 75 Fed. 554, 565, 23 C. C. A. 302, furnishes an illustration of a principle which we think here applicable, though the analogy is imperfect. In that case this court recognized that the directors of an insolvent Michigan corporation in process of liquidation, and who were also creditors, had a legal right to devote the entire assets to the payment of their debts, leaving others unpaid; but the exercise of this legal right was required to be free from unfairness to the excluded creditors, beyond the alleged unfairness inherent in the right, and when it appeared that the excluded creditor had been misled into being quiescent when he might have been vigilant in the protection of his own rights, it was held that the preferential payment should be vacated and he should receive his pro rata share. If the present case were brought against the banks, who, while in control of the corporation, secured their pay in full, and if there were evidence by which they could be charged with knowledge of the Oehring claim, it would approximate the Rickerson Case; but there is here a lack both of pleading and of parties to proceed upon that theory.

A similar principle might even be applied, under conceivable facts, to make the class of purchasers of the property open and let in Oehring for a proportionate interest; but here, again, there is a lack of pleadings and of parties, to say nothing about the difficulty of upsetting the contract of the purchasers, who insist that they would not have bought at any substantially greater price. It does not follow that there is no remedy for Oehring, and substantially within the lines of his bill of complaint. The old company had actual notice of Oehring's claim. All its stockholders would be, for many purposes, chargeable with notice. Practically all the stockholders in the new company were also stockholders in the old one, and the three or four active promoters of the new company had actual notice. It must follow that the new company, through the medium of its body of stockholders and its promoters, was chargeable with this notice. Under these conditions, all the participants in the plan to devote the entire assets to the payment of debts other than Oehring's must be held to a scrupulous regard of his rights, whatever they were; and when this duty is coupled with the facts that there was a general assumption that all debts were being provided for, that no actual notice of sale was given to him, that he had no constructive notice through the happening of a public sale or receivership, or any procedure that would attract general attention, and that the new company continued the same business under the

same name, with no indicia of a change, we think equity requires that Oehring should be restored to the position which he might have had, if he had received notice and had opportunity to protect his interests, as far as such restoration can take place without prejudice to equities equally as strong as his.

5. After it had been determined to sell the assets at $46,000 and pay the book debts, if Oehring had appeared on the ground, what would have been his standing? What the parties would have done by way of compromise, adjustment, or yielding can only be surmised. In looking backward, to restore the situation which should now be recognized as a basis for relief, we can only assume that each party would have availed itself of its full legal rights. Oehring had no judgment, or any certainty that he would ever get any; the procedure of the banks to get their pay in full would not have been enjoined until the future indefinite time when Oehring's suit might be finished; the transaction by which all the assets were to be sold and the money used to pay the book debts was not in form preferential, because Oehring was not recognized, but in substance it was, and, whatever the parties might have done under other conditions, this is what they did do; and, as we have said, it was their legal right, in Michigan, to devote all the assets first to this purpose, leaving only the surplus, if there was one, for Oehring. The utmost relief which could have been given him at the time would have been the making of a decree or order by which he should have a chance to participate in fixing the realizable value of the assets—as at a public sale—and by which the surplus, if any, over the $46,000 necessary to pay the debts which could be given priority over him, should be preserved for the satisfaction of any judgment which he might be able to obtain. This was the limit of his right which could have been preserved against the other adverse rights if they had been asserted to their respective limits; and it is this right, and only this, to which Oehring should be restored, as against the interests of the $46,000 purchasers.

6. This record does not inform us how far the body of property which might have been available to create this surplus has been preserved, nor what changes there have been in it. For the present, we assume that, as between Oehring and the $46,000 purchasers, the general identity of the body of the property has been preserved in specie or by substitutions, except for additions which have been made as the result of new capital. In view of the limited character of Oehring's right, and the absence of any lien in his favor (since we recognize that he lost, not a lien, but a contingent right to get a lien), his claim against this body of property should be considered as subject to, first, the debts of the new company; second, additional capital which has been put into the company since its organization, which debts and additional capital may be assumed to stand for additions and improvements which ought not to be subject to Oehring's claim; and, third, the $46,000. Any general gain or loss in value of the assets since 1915 is an incident to which the parties respectively must submit.

We cannot undertake to fix the details of the provisions which will accomplish the general result we have indicated. They must be left

to the court below. This record has not been shaped to this end. Special equities may appear which should be recognized, and the court below will do so. Of course, there should be reasonable ground to anticipate that a surplus for Oehring would result, before the new company is subjected to burdensome proceedings.

We do not regard the Michigan Bulk Sales Law as applicable.

The decree below is reversed, and the record remanded for the entry of a new decree in accordance with this opinion.